**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**J. D. INDUSTRIAL INSULATION COMPANY, INC., Respondent.**

No. 78–1254.

United States Court of Appeals, Tenth Circuit.

Argued Sept. 13, 1979.

Decided Feb. 8, 1980.

---

* The Honorable Donald J. Porter, United States District Judge for the District of South Dakota, sitting by designation.

W. Christian Schumann, Washington, D. C. (Paul J. Spielberg, Deputy Asst. Gen. Counsel, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., on brief), for petitioner.

William E. Myrick, Myrick, Newton & Sullivan, P. C., Denver, Colo., for respondent.

Before HOLLOWAY and DOYLE, Circuit Judges, and MATSCH, District Judge.*

MATSCH, District Judge.

Pursuant to Section 10(e) of the National Labor Relations Act ("Act"), as amended, 29 U.S.C. § 160(e), the National Labor Relations Board ("NLRB") seeks enforcement of its Decision and Order against J.D. Industrial Insulation Co., Inc. ("Company"), issued on January 10, 1978, and reported at 234 NLRB No. 14. Two questions are presented: (1) Whether substantial evidence on the record as a whole supports the Board's finding that the Company was bound by a collective bargaining agreement with a multi-employer organization, either as an implied contract or under the doctrine of estoppel; and (2) Whether substantial evidence on the record as a whole supports an independent finding and conclusion that the Company violated Sections 8(a)(1) and (3) of the Act by a discriminatory termination of employees because of their union membership.

Western Insulation Contractors Association ("WICA") is a national association of insulation installers which has a Colorado chapter. The by-laws of WICA authorize it to act as the collective bargaining representative for all member contractors with respect to terms and conditions of employment of members of Asbestos Workers Local Union No. 28 ("Union"). WICA also represents non-member contractors who specifically assign their bargaining rights to WICA's labor committee. Any member contractor who withdraws from WICA during the term of a collective-bargaining contract continues to be bound by it for the duration of the contract's term under the by-laws. The Union enters into "short form" agreements with contractors who are not WICA members and who thereby agree to conform to the WICA–Union agreement. At all times relevant herein, WICA and the Union were parties to a collective-bargaining contract which was effective from September 27, 1975 through July 31, 1978.

Dee J. Byrnes did insulation work as a union member for a number of years before he organized the Company in 1963, at which time he signed a union withdrawal card. He was not a union member at any of the times relevant to this dispute. Dee Byrnes has always been the chief executive officer of the Company.

The Union brought the subject charges against the Company on March 1, 1977, in consequence of the termination of the employment of five employees who had been working on a job at the Warren Air Force

* Of the District of Colorado, Sitting by Designation.

Base at Cheyenne, Wyoming and a sixth worker who was to be transferred to that site. An Administrative Law Judge ("ALJ") who received the evidence introduced by General Counsel, the Charging Party, and the Respondent, wrote detailed findings of fact, which include the following:

. . . Respondent is not at the present time, was not at the time the relevant WICA–Union contract was negotiated in 1975 and signed effective September 27, 1975, and (except possibly the period January, February and March 1976, discussed *infra*) never has been, a formal member of WICA.

The threshold question, therefore, is whether, by paying WICA dues for 3 months, Respondent thereafter was bound by the WICA–Union contract during its full term. An antecedent issue is whether Respondent became a member of WICA for those 3 months.

So far as WICA membership is concerned, it may well be, as argued by Respondent, that General Counsel was unable to prove formal membership. However, much more than that technicality is involved. Clearly Byrnes engaged in a course of conduct over a long period of time, that was inconsistent with nonmembership.

The ALJ then referred to the fact that the Company had membership in a predecessor association; that the Union's hiring hall had been used to obtain employees; that the Company paid at least union wages, made trust fund payments and submitted monthly reports showing compliance with the benefit provisions of the WICA–Union contract for its union employees; that over the years 95% of the Respondent's work has been for contractors who required a union work force; that in October 1974, Byrnes acknowledged a contract violation before the Joint Trade Board, paying a fine; that Byrnes attended WICA meetings and discussed proposed contract terms during the negotiation of the WICA–Union contract in September 1975; that Byrnes attended WICA meetings after September 1975, participating therein; that Byrnes ac-

cepted a WICA membership plaque and was introduced to WICA members as "a new member" on March 19, 1976; and that Byrnes attended a special Joint Trade Board meeting on September 2, 1976 to hear charges brought by the Union against another employer.

The ALJ then held as follows:

In view of the foregoing indicia of membership, Respondent's reliance upon the facts that it never filed an application for membership, or paid an initiation fee, or appears on any membership list, is misplaced. Clearly Byrnes led other members of WICA, and the Union, to believe that he was a WICA member when it was to his advantage or to his liking to be considered a member. It would be an injustice now to permit Respondent to avoid the responsibilities of membership upon the basis of a technicality. Respondent is estopped by its actions from engaging in such inconsistent conduct.

The ALJ went on to find that "there is no question but Respondent was a member of WICA for at least three months" and "it is clear that Respondent became a member of WICA in January of 1976 and thereby became bound by the WICA–Union contract."

The NLRB delegated its authority in this matter to a three member panel which accepted the credibility findings made by the ALJ, and then modified his decision as follows:

We agree with the Administrative Law Judge that, due to Respondent's having engaged in a course of conduct consistent with membership in the Western Insulation Contractors Association (WICA), it was estopped from avoiding the responsibilities of association membership. In so doing, however, we disavow the Administrative Law Judge's finding, as reflected in his Conclusions of Law, that Respondent's payment of dues to the Association from January through March 1976 specifically initiated its obligations as an association member as of January 1, 1976. Rather, we rely on Respondent's entire

course of conduct as set forth by the Administrative Law Judge, including its payment of dues as a factor, in finding that Respondent held itself out as an association member to other members of the Association and to the Union and was bound by the WICA Union Contract at all times material herein. See, particularly, *Vin James Plastering Company*, 226 NLRB (1976).

The scope of judicial review of an NLRB record on an enforcement application compels careful consideration of all of the evidence, including whatever fairly detracts from the Board's findings and conclusions. *NLRB v. Midwestern Manufacturing Co.*, 388 F.2d 251, 255 (10th Cir. 1968); *NLRB v. Consolidated Diesel Electric Co. Division of Comdec Corp.*, 469 F.2d 1016, 1021 (4th Cir. 1972); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 492–93, 71 S.Ct. 456, 466–67, 95 L.Ed. 456 (1951).

■ Clearly there is no basis in the evidence or the law for the determination by the ALJ that the mere payment of dues to WICA in January, February, and March, 1976 established the Company's membership in the association. Accordingly, the Board's disavowal of that conclusion was correct.

Here, it is unquestioned that the Company never made an application for membership in WICA; never paid the standard initiation fee for such membership; never signed a power of attorney or other authorization for WICA to bargain for it; and never entered into a short-form agreement with the Union. The record is inadequate to find the existence of a contract by implication. Accordingly, there was no legal contract between the Company and the Union.

Affirmance of the Board's determination that the Company had enforceable obligations under the WICA–Union contract depends upon the applicability of the doctrine of estoppel to the facts in this record. Historically, estoppel is an equitable remedy for the unfairness which would result from the application of strict legal principles. See 1A Corbin on Contracts §§ 205–206 (1963).

The evidence of conduct consistent with an acceptance of the terms and conditions of the agreement is essentially uncontested. There is also uncontradicted evidence which is countervailing to that relied upon by the Board. On July 25, 1975, while negotiations leading to the WICA–Union agreement were in process, Dee J. Byrnes wrote a letter to WICA as follows:

> As to your letter a few weeks ago, and at your luncheon meeting of this week. I would like to thank you for both, however at this time I feel I am capable of doing my own bargaining with the local # 28, as a independent contractor, for their are many points of their contract that I do not agree with.

On October 21, 1975, a few weeks after the effective date of the WICA–Union contract, the Union's business agent wrote to Byrnes, forwarding two copies of a short-form agreement for his signature. The business agent testified that this was in response to Mr. Byrnes' request; but, Mr. Byrnes denied making such a request and the ALJ did not resolve that conflict, although he made general findings deprecating the credibility of the business agent as a witness.

The ALJ found it significant that D.J. Byrnes went with the same business agent to a Joint Trade Board hearing on charges against a WICA member on September 2, 1976. Again, there is an unresolved conflict in the testimony of these two witnesses as to their conversation concerning the reason for attending that meeting. Neither the ALJ nor the Board gave any importance to the undisputed fact that just a month later, on October 7, 1976, the same business agent again sent copies of short-form agreements to Mr. Byrnes, signed by the Union and dated October 7, 1976. Again there is an unresolved dispute in the testimony as to the initiating force for sending this agreement. Dee Byrnes disregarded the WICA–Union contract on about half the jobs by using non-union employees and personally performing insulation work. He never notified the Union of those jobs and there is no basis for finding that the Union was aware of them.

This record shows a small union of about two hundred members and a small contractor operating very informally and without problems during a period of full employment. The Union passively permitted the Company to operate without Union interference in dealing directly with its employees on wages and other terms of its employment. Indeed, the undisputed evidence is that Mr. Byrnes negotiated such matters individually with particular employees. Apparently that was of no concern to the Union because everyone was happy. The circumstances began to change in late 1976 because of economic conditions affecting employment and because the Company was confronting severe financial problems on the Warren Air Force Base job. In November 1976, the Company fired the employees who were working on that job site and replaced them with other Union members. The Union did not disapprove of that action.

When the Company's financial distress on the Cheyenne job became acute in January 1977, Mr. Byrnes met with the union men on that job, negotiated directly with them, and reached an agreement whereby the workers alternated work weeks to avoid a general layoff. After two weeks of that approach, Mr. Byrnes concluded that he could not avoid a breach of his construction contract or bankruptcy without taking drastic action. It was then that he terminated the employees and began doing the work himself with non-union help.

■ Where both parties to an ambiguous arrangement have acted or failed to act in ways which contribute to that ambiguity, it is inequitable to fault only one of them. The Company's conduct which was found to be inconsistent with nonmembership would appear to be offset by the Union's continuing acceptance of uncertainty. The business agent testified that he did not have and did not ask for a list of WICA members and there is nothing in the record to show that he or any other union official made any attempt to obtain anything from the Company which would clarify its position, except for the forwarding of the short-form agreements which were never returned.

Quite apart from such an equal fault analysis, an essential element of an equitable estoppel is detrimental reliance. That is absent from this record. The Union obtained equal benefits from its relationship with the Company. Its members were receiving wages higher than scale and its trust funds were being paid in full. If there was a feeling of insecurity about the future, it would have been no difficult task for the Union to insist that the Company acknowledge membership in the association, explicitly adopt the WICA–Union agreement, or execute a short-form agreement.

Equitable estoppel has been used to require adherence to multi-employer agreements by nonmembers without an articulation of the traditional principles limiting the doctrine. *Vin James Plastering Co.*, 226 NLRB 125 (1976). In *NLRB v. Southwestern Colorado Contractors Association*, 379 F.2d 360 (10th Cir. 1967), this court found that the Board's inference of an association's authority to bind contractors from their course of conduct was reasonable. There was no inconsistent conduct and it was not necessary to discuss estoppel.

In *NLRB v. Associated Shower Door Co., Inc.*, 512 F.2d 230 (9th Cir.), *cert. denied*, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975), the court applied the substantial evidence rule to affirm the Board's finding that the employers had retracted their withdrawal from association membership by inconsistent conduct. Again, it was not necessary to discuss estoppel.

Two other cases relied upon by the Board are inapplicable. In *NLRB v. R.O. Pyle Roofing Co.*, 560 F.2d 1370 (9th Cir. 1977), the court affirmed findings that a member of a contractor's association had created at least apparent authority to bind him to an agreement by making a broad assignment of rights in accordance with a well established practice. *Rabouin v. NLRB*, 195 F.2d 906 (2nd Cir. 1952) held that it was not necessary that an association member sign and ratify a labor agreement which had been negotiated on his behalf.

It is well established that one who claims under the doctrine of equitable estoppel must show: (1) lack of knowledge and of the means to obtain knowledge of the true facts; (2) good faith reliance upon the misleading conduct of the party to be estopped; and (3) detriment or prejudice from such reliance. *United States v. Aetna Casualty & Surety Co.*, 480 F.2d 1095, 1099 (8th Cir. 1973); *cf. Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir. 1960).

Here, taking the record as a whole, the evidence supporting the contention that the Union lacked information or the means to obtain information concerning the Company's membership status in WICA, and the evidence indicating detrimental reliance on conduct suggesting membership, can not be characterized as substantial. That conclusion requires denial of those portions of the Board's order which are based upon violations of Section 8(a)(5) of the Act because that section is not applicable in the absence of a collective bargaining agreement.

The evidence is fully supportive of the Board's findings concerning the Company's discharge of the five union members who were working on the Cheyenne job and the sixth employee who was going to be transferred. There can be no doubt that the Company sought to save itself from losses by turning that project into a non-union job, thereby avoiding payment of union scale wages and benefits. That constitutes discrimination which discourages membership in a labor organization in violation of Sections 8(a)(1) and (3) of the Act. By discharging Thomas Gardner, John Compton, Howard Remick, Robert Remick, Donald Remick and Stan Wernet, the Company engaged in unfair labor practices in violation of those sections. Accordingly, it is

ORDERED, that the application for enforcement is granted, with respect to those portions which relate to the discriminatory termination of employment of union members, including unconditional reinstatement of Thomas Gardner, John Compton, Howard Remick, Robert Remick, Donald Remick

and Stan Wernet to their former or substantially equivalent positions and to make each of them whole for any loss of wages suffered by reason of the Company's conduct and that in all other respects the application for enforcement is denied.