**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Scott V. BROWN, et al.,**
**Defendants-Appellants.**

**No. 80–1448.**

United States Court of Appeals, Tenth Circuit.

March 15, 1982.

---

**810**

et title decree. They also asserted counter-claims alleging that Brown holds equitable title to the property or, alternatively, that the administrative actions of the Bureau of Land Management (BLM) which underlie this lawsuit were arbitrary, capricious, and an abuse of discretion. After a bench trial, the court ordered entry of a decree quieting title in the United States. On appeal, defendants reassert essentially the same arguments. We affirm.

## I

## BACKGROUND

 A brief discussion of the relevant legislation and the facts generating this litigation is in order. The Surface Resources Act of 1955, 30 U.S.C. § 601, *et seq.*, prohibits holders of unpatented mining claims from using the land for anything but mining purposes. 30 U.S.C. § 612(a).[1] A patent for a mining claim on public land cannot be issued unless the land contains valuable minerals. *Best v. Humboldt Placer Mining Co.*, 371 U.S. 334, 336, 83 S.Ct. 379, 382, 9 L.Ed.2d 350 (1963). People who occupy unpatented mining claims as residences are thus subject to trespass claims and ejectment actions by the United States if the land cannot be patented. Nevertheless,

> "[s]ince the early days of the West, miners have historically made homes on their claims. Many claims, valid when first occupied, were worked out or for other reasons were not qualified for patent, but their possessors continued to live upon them. Many of these claims were purchased in good faith as places of residence by persons who believed they obtained legal title to the property. Several thousand unpatented mining claims, it is estimated, are being used in the Western States as residential sites."

S.Rep.No.593, 90th Cong., 1st Sess., *reprinted in* 1967 U.S.Code Cong. & Ad.News 1751, 1752.

Spencer T. Denison of Holme, Roberts & Owen, Denver, Colo., for defendants-appellants.

Robert D. Clark, Atty., Dept. of Justice, Washington, D. C. (James W. Moorman, Asst. Atty. Gen., Washington, D. C., Joseph F. Dolan, U. S. Atty., Jerry B. Tompkins, Asst. U. S. Atty., Grand Junction, Colo., Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., with him on the brief), for plaintiff-appellee.

Before BARRETT, DOYLE and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

The United States brought this suit under 28 U.S.C. § 1345 to quiet title to a five acre tract of land in Colorado. Defendants Scott Brown and Teddie Trout conceded that the United States holds bare legal title to the property but defended on the ground that the legal description contained in the complaint was insufficient to support a qui-

---

1. 30 U.S.C. § 612(a) provides:

 "Any mining claim hereafter located under the mining laws of the United States shall not be used, prior to issuance of patent therefor, for any purposes other than prospecting, mining or processing operations and uses reasonably incident thereto."

This state of affairs had the potential for creating great hardship to residential occupants of unpatented mining claims. In response to the situation, Congress in 1962 enacted the Mining Claims Occupancy Act (MCOA), 30 U.S.C. § 701 *et seq.* "The bill is a relief measure designed to aid those qualified people on whom a hardship would be visited were they to be required to move from their long-established homes." S.Rep. No.1984, 87th Cong., 2d Sess., 108 Cong.Rec. 18786 (1962). Under the MCOA, the Secretary of the Interior is given discretionary authority to convey an interest in land to qualified applicants living on unpatented mining claims. 30 U.S.C. §§ 701, 702.[2]

Defendant Teddie Trout's husband George acquired the property at issue by quit claim deed in 1958. The original 20 acre tract was an unpatented mining claim which had a long history of residential occupancy. Apparently it had not been used for mining purposes in many years. George bought the improvements, consisting of several ramshackle buildings, and assumed the mining claim. The Trouts retired, moved onto the land, and built a modern home there.

In 1963 the Trouts became aware of the relief offered by the MCOA and applied to receive a patent for the five acres immediately surrounding their residence as permitted by the Act. Pursuant to the requirements of the MCOA, they voluntarily relinquished their mining claim. The Bureau of Land Management (BLM) decided that the Trouts were qualified applicants. However, no reliable survey of the area existed upon which an aliquot parts description of the land could be made and no survey corner markers could be located on the land. Thus the BLM determined that a land description sufficient to enable issuance of a patent was impossible, and offered the Trouts a ten year lease to begin on January 1, 1964. The lease contained a metes and bounds description tied to a culvert and gave the Trouts a preferential right of renewal.

After the lease term began, the Trouts maintained a continuous and unsuccessful effort to have the survey made that was necessary to the issuance of a patent. In response to their inquiries, the BLM told the Trouts that an extensive area would have to be resurveyed, that funding was a serious problem, and that other projects had a higher priority.

The Trouts resided on the land until George's poor health forced them to move into town in 1966. The house they had built was sold and moved off the property at that time. Although they permitted a young couple to live on the land rent free for about three years, that couple moved away before Brown became interested in the property.

Scott Brown first inquired about the property in 1972. In July of that year, he obtained a sublease from Trout for a period of 40 years. Such a sublease is invalid under the MCOA. *See* 30 U.S.C. § 708.[3] George Trout died December 15, 1972, and

---

2. 30 U.S.C. § 701 provides in relevant part:

"The Secretary of the Interior may convey to any occupant of an unpatented mining claim which is determined by the Secretary to be invalid an interest, up to and including a fee simple, in and to an area within the claim of not more than (a) five acres or (b) the acreage actually occupied by him, whichever is less. The Secretary may make a like conveyance to any occupant of an unpatented mining claim who, after notice from a qualified officer of the United States that the claim is believed to be invalid, relinquishes to the United States all right in and to such claim which he may have under the mining laws. Any conveyance authorized by this section, however, shall be made only to a qualified applicant, as that term is defined in section 702 of this title, who applies therefor within the period ending June 30, 1971, and upon payment of an amount established in accordance with section 705 of this title."
30 U.S.C. § 702 states:

"For the purposes of this chapter a qualified applicant is a residential occupant-owner, as of October 23, 1962, of valuable improvements in an unpatented mining claim which constitute for him a principal place of residence and which he and his predecessors in interest were in possession of for not less than seven years prior to July 23, 1962."

3. 30 U.S.C. § 708 provides:

"Rights and privileges to qualify as an applicant under this chapter shall not be assignable, but may pass through devise or descent."

devised his interest in the property to Brown. Brown and his friends occupied the tract sporadically in 1972 and 1973, and did some work on the old cabins remaining on the land. The BLM discovered that the Trouts no longer used the parcel as their residence and notified Brown that the lease would not be renewed when it expired at the end of 1973. Brown appealed this decision administratively to the Interior Board of Land Appeals (IBLA), which affirmed it. The United States filed the instant action, seeking to quiet title and obtain removal of the remaining buildings.

The land at issue is a mountain site adjacent to state highway 145 near Telluride in San Miguel County. Power and telephone lines are connected to one of the cabins and the only water available is from Summit Creek, which runs through the property. Development of a multi-million dollar ski resort began near Telluride in 1970, causing an increase in the value of property in the area. In 1958 Trout paid $2000 for the improvements on the land, and Brown paid Trout that amount in 1972 pursuant to the sublease agreement. The BLM appraised the fair market value of the parcel in 1979 at $30,000.

On appeal, Brown first argues that the legal description on which the United States bases this quiet title action is insufficient. He also contends that George Trout was vested with equitable title to the property during his lifetime as a result of representations made by the BLM to Trout upon which he relied, and as a matter of law. Finally, he urges that the administrative decision not to renew the lease or convey fee title was arbitrary, capricious and an abuse of discretion. The latter two arguments are essentially grounded on Brown's

assertion that the United States is equitably estopped to refuse to convey a patent to Brown as the devisee of all of Trout's interest in the land.

## II

## THE LAND DESCRIPTION

Brown contends that the description of the tract contained in the ten year lease, on which description the quiet title complaint is based, is inadequate to sustain a quiet title action.[4] He argues that if the description was not sufficient to enable the BLM to convey fee simple title, it is not sufficient for purposes of a quiet title decree. We disagree. The description in the lease, although not a textbook model as the trial court noted, is nonetheless adequate under the facts of this case. The land surrounding the tract at issue is all public land. The description in the lease is adequate to quiet title to the leased lands in the Government and return the tract to the public lands around it.

## III

## EQUITABLE TITLE

Brown contends the BLM made representations to Trout that a patent would be conveyed as soon as a survey of the area was made. He then argues that the BLM is equitably estopped from refusing to convey a patent to Brown as Trout's successor in interest.

In the first letter that George Trout received from the BLM, the State Director stated:

"It must also be emphasized that the filing of either a petition or an application does not necessarily mean that an

---

4. The land description is as follows:
 "T. 43 N., R. 10 W., New Mexico Principal Meridian, Colorado
 "A tract of land lying approximately in Sections 22 and 27, Beginning at corner No. 1, from which the north end of the culvert by which the water from Summit Creek is conveyed across State Highway 145, at approximately Station 400, as described in right of way map, Colorado 0360, bears south 79[degrees] 30' W., 61 feet.

 From Corner No. 1, by metes and bounds
 N. 5[degrees] 30' W. 541 feet to corner # 2
 S. 84[degrees] 30' W. 400 feet to corner # 3
 S. 5[degrees] 30' E. 541 feet to corner # 4
 N. 84[degrees] 30' E. 400 feet to corner # 1
 The place of beginning, containing approximately 5 acres . . .,"
 Rec., vol. V, Pl. Ex. 9.

applicant will receive title to or an interest in the land which is being occupied for residential purposes. The qualifications of each applicant and the circumstances surrounding each case must be carefully considered by this Bureau before a commitment in this respect can be made." Rec., vol. V, Def. Ex. B. The decision to offer Trout a lease contains the following language:

"Field examination and subsequent office research discloses that the land grid covering the township is for the most part completely unreliable. For this reason, an aliquot parts description (for example, E ½ SW ¼ SW ¼ SW ¼) cannot be developed for the land occupied by the applicant's residence and other improvements. The applicant and the field examiners were unable to locate any mining claim survey corners or land grid corners from which it would be possible to develop an adequate description except by costly and time-consuming survey made by officials of this Bureau. Because of prior commitments to other projects and other factors, such survey could not be made in the immediate future.

"Since it is not possible to prepare a land description which would be sufficient for issuance of a patent, sale of land cannot be considered at this time.

"However, it has been determined that a lease may issue for land as described in the attached lease forms, which appears to be the same as that occupied by the applicant's residence. *Such lease* would issue for a term of ten years, with rental at the rate of $12.75 per year, payable in advance for each two-year period, and *would be subject to renewal at the end of such ten-year period if otherwise authorized* under the Act of October 23, 1962, and other applicable laws and regulations then in effect *and if the survey has not been completed to enable issuance of patent.* Other terms and conditions are set forth on the enclosed lease forms."

Rec., vol. V, Def. Ex. E (emphasis added).

The lease itself does not mention conveyance of a patent upon completion of a survey. We agree with the trial court's finding that these documents do not rise to an unconditional commitment by the BLM to convey fee simple title after the survey. The most that can be said is that the BLM agreed to *consider* issuance of a patent when a sufficient land description could be made.

Defendants admit in their brief on appeal that the central document upon which their claim is based is a BLM memorandum on November 5, 1963, from the land office manager to the Colorado state director. We find this evidence no more persuasive than that quoted above. Moreover, the memorandum was not available to Trout. "To constitute estoppel there must be deception relied upon by the other to his detriment." *McWaters & Bartlett v. United States ex rel. Wilson*, 272 F.2d 291, 296 (10th Cir. 1959); *accord, N. L. R. B. v. J. D. Industrial Insulation Co.*, 615 F.2d 1289, 1293-94 (10th Cir. 1980). A claim of estoppel clearly may not arise in favor of a person who did not have access to the allegedly misleading representations.

On the basis of the documentary evidence and the testimony of Teddie Trout and Scott Brown, the trial court concluded that nothing in the record supports the claim of estoppel. Such a finding may not be overturned on appeal unless it is clearly erroneous. *See* Fed.R.Civ.P. 52(a). Under this standard, we must uphold the findings unless upon review of the entire record we are left with a definite and firm conviction that a mistake has been made. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). We have no such conviction in this case.

Brown also argues that equitable title passed to Trout during his lifetime as a matter of law, and that therefore the United States is obligated to convey naked legal title to him as Trout's successor in interest. In support of this proposition he cites *Benson Mining & Smelting Co. v. Alta Mining & Smelting Co.*, 145 U.S. 428, 12 S.Ct. 877, 36 L.Ed. 762 (1892), a case decided under

the General Mining Act of 1872, as amended, 30 U.S.C. § 21 *et seq.* However, we agree with the district court's conclusion that the doctrine of equitable title articulated in *Benson* does not apply to applications made under the MCOA. Under the General Mining Act, the locator of a claim who complies with the relevant procedures is "*entitled* to a patent for the land . . . ." 30 U.S.C. § 29 (emphasis added). There the Secretary has no discretion to withhold a patent from a qualified applicant. This is plainly not true under the MCOA. The statute and the legislative history of this Act make clear that the decision whether to issue a patent or some lesser interest in land to a qualified person is committed to the Secretary's discretion. Equitable title thus cannot be obtained by an applicant merely because he qualifies under the Act. In essence, Brown claims that Trout acquired equitable title to the land because the BLM committed itself to the issuance of a patent, an argument we have rejected above.

## IV

### THE ADMINISTRATIVE DECISION

Even if the Government is not estopped to deny him title to the property, Brown argues that the decision not to give him a renewal of the lease or a patent was arbitrary, capricious, and an abuse of discretion. First, however, we must consider the Government's contention that the decision whether to convey an estate in land pursuant to the MCOA is a matter committed to agency discretion and is therefore not reviewable.

A presumption exists in favor of a judicial review for one who has been adversely affected by agency action. *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140–41, 87 S.Ct. 1507, 1510–11, 18 L.Ed.2d 681 (1967). As we said in *Sabin v. Butz,* 515 F.2d 1061, 1065 (10th Cir. 1975):

"The cited exception for discretionary action is a very narrow one, applicable in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136; see *National Helium Corp. v. Morton,* 455 F.2d 650, 655 n. 12 (10th Cir.); *Parker v. United States,* 448 F.2d 793, 795 (10th Cir.), cert. denied sub nom. *Kaibab Industries v. Parker,* 405 U.S. 989, 92 S.Ct. 1255, 31 L.Ed.2d 455."

The MCOA is not drawn in such broad terms that the administrative exercise of discretion is non-reviewable for lack of law to apply. For example, the statute specifically provides that "[a]ny conveyance authorized by this section, . . . shall be made only to a qualified applicant, as that term is defined in section 702 of this title . . . ." 30 U.S.C. § 701. Although the Secretary's discretion under the Act is great, we conclude that it is subject to a limited scope of review. *Cf. Sabin,* 515 F.2d at 1065 (judicial review available for Secretary's issuance of National Forest land use permits under 16 U.S.C. § 497). Accordingly we must decide whether the decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

The IBLA first determined that the initial decision to grant Trout a ten year lease rested on a rational basis. We agree that the BLM decision not to convey a fee simple title to a parcel of land carved out of public lands without an adequate survey was rational. The IBLA then stated:

"The Mining Claims Occupancy Act was enacted by Congress as a relief measure designated to aid qualified mining claimants on whom hardship would be imposed in the event they were required to move from their long-established homes which were placed on unpatented mining claims. In our view, the relief contemplated by the Act was afforded to the deceased Mr. Trout. While the Bureau at one time may have considered granting a fee title to Mr. Trout, the spirit of the Act has been fulfilled insofar as he is concerned."

Rec., vol. V, Pl. Ex. 8 at 4. The IBLA concluded that Brown himself was not a qualified applicant for whom relief might be available under the Act, and affirmed the BLM decision not to renew the lease or convey fee title to him. We do not find this action arbitrary, unreasonable, or a clear error in judgment. Indeed, a decision to grant any interest to Brown, who was not eligible in his own right to receive relief under the MCOA, would have been beyond the authority provided by the Act and would itself have constituted an abuse of discretion.

We have reviewed defendants' other contentions and find them to be without substance. The decree of the trial court quieting title to the subject tract of land in the United States is affirmed.