28 F.3d 678
 146 L.R.R.M. (BNA) 2784, 128 Lab.Cas. P 11,126
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
and
Local 703, IBT, AFL-CIO, Intervening Petitioner,
v.
DOMINICK'S FINER FOODS, INC., Donna's Distribution,
Certified Grocers Midwest, Inc., and Mavo Leasing,
Respondents.
PRODUCE, FRESH & FROZEN FRUITS & VEGETABLES, FISH, BUTTER,
EGGS, CHEESE, POULTRY, FLORISTS, NURSERY, LANDSCAPER &
ALLIED EMPLOYEES, DRIVERS, CHAUFFEURS, WAREHOUSEMEN AND
HELPERS UNION, LOCAL 703, as a Division of Truck Drivers,
Chauffeurs, Warehousemen and Helpers Union, Local 707,
affiliated with the National Production Workers Union, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Local 703, IBT, AFL-CIO, Intervening Respondent.
 Nos. 93-1365, 93-1545.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 9, 1993.
Decided July 1, 1994.
Rehearing and Suggestion for Rehearing En Banc Denied Oct. 26, 1994.
 
 1
 Joseph Oertel (argued), N.L.R.B., Contempt Litigation Branch, Washington, DC, Elizabeth Kinney, N.L.R.B., Chicago, IL, Aileen A. Armstrong, Howard E. Perlstein, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, DC, for N.L.R.B.
 
 
 2
 Neal Petronella, P. Neill Murphy, John Murphy (argued), Kovar, Nelson, Brittain, Sledz & Morris, Chicago, IL, for Dominick's Finer Foods, Inc.
 
 
 3
 Neal Petronella, P. Neill Murphy, Kovar, Nelson, Brittain, Sledz & Morris, Chicago, IL, for Donna's Distribution.
 
 
 4
 Jeffrey S. Goldman, Joshua D. Holleb, Fox & Grove, Chicago, IL, for Certified Grocers Midwest, Inc.
 
 
 5
 Anthony S. Graefe, Brian Steinbach, Banta, Cox & Hennessy, Chicago, IL, for Mavo Leasing.
 
 
 6
 Susan Brannigan, Asher, Gittler, Greenfield, Cohen & D'Alba, Chicago, IL, for Local 703, International Brotherhood of Teamsters, AFL-CIO.
 
 
 7
 Cora M. Vaughn (argued), Vaughn & Associates, Gary, IN, for Produce, Fresh & Frozen Fruits & Vegetables, Fish, Butter, Eggs, Cheese, Poultry, Florists, Nursery Landscape & Allied Employees, Drivers, Chauffers, Warehousemen and Helpers Union Local, 703.
 
 
 8
 Before CUDAHY and ROVNER, Circuit Judges, and WILL, District Judge.*
 
 
 9
 WILL, District Judge.
 
 
 10
 Before us are cross-petitions to enforce and review an order by the National Labor Relations Board ("the Board") finding the respondents Truck Drivers Local 707 of the National Production Workers' Union, Dominick's Finer Foods, Donna's Distribution, Certified Grocers Midwest, Inc., and Mavo Leasing guilty of unfair labor practices in a representation dispute with Local 703 of the International Brotherhood of Teamsters, AFL-CIO. For the reasons set forth below, we enforce the Board's decision. While the companies have not requested review of the Board's decision, they do request that this Court clarify the Board's decision by holding Local 707 primarily liable and the companies secondarily liable for repayment of union fees and dues. However, because we lack jurisdiction, we do not reach the merits of this issue.
 
 I. Introduction
 
 11
 Local 703 of the International Brotherhood of Teamsters, AFL-CIO ("Local 703") is the exclusive bargaining agent for a number of companies in the Chicago area. Local 703 represents employees of Dominick's Finer Foods, Inc., Donna's Distribution, Certified Grocers Midwest, Inc., and Mavo Leasing, referred to collectively as the "companies." Dominick's, Donna's and Mavo Leasing executed exclusive bargaining contracts with Local 703 for a 39-month term from January 1, 1987 until March 31, 1990. Local 703 and Certified entered into a similar contract with a 36-month term from April 1, 1988 until March 31, 1991. In July of 1988, Local 703 and each of the companies extended the contracts so that they would expire on March 31, 1996.
 
 
 12
 In June of 1988, one month before the contracts were extended, the United States Department of Justice filed suit against the International Brotherhood of Teamsters ("IBT") and several international and local officers, seeking the removal of these officers under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). One of the officers the Justice Department sought to remove was Dominic Senese, president of Local 703. On March 14, 1989, the District Court for the Southern District of New York approved a consent decree providing for an Independent Administrator to oversee the removal of criminals from the IBT. The Independent Administrator subsequently ordered Dominic Senese to resign as president of Local 703 and suspended him from the IBT for life because of his association with known members of La Cosa Nostra. The Independent Administrator's order was affirmed on review.
 
 
 13
 Pursuant to the order, Senese resigned as president of Local 703 on August 30, 1990. His position was filled by Leonard Joseph II, a trustee and member of Local 703's executive board. Joseph was replaced as trustee by Joseph R. Senese, Dominic Senese's nephew. Dominic Senese's son, Lucian, subsequently took over as Local 703's secretary-treasurer.
 
 
 14
 The other union involved in this suit is Truck Drivers Local 707 NPWU ("Local 707"). The National Production Worker's Union ("NPWU") is an unaffiliated group of four unions, each bearing the name Local 707.[1] The overall president of the NPWU was Joseph V. Senese, Dominic Senese's son and Lucian Senese's brother. In September 1990, Leonard Joseph and Local 707's president, Philip Cappitelli, discussed transferring control of Local 703's pension fund, health and welfare fund, and severance and retirement fund to Local 707. The assets of these three funds totaled between $110 and $120 million.
 
 
 15
 Shortly thereafter, Local 703 asked each company to sign a separate Memorandum of Agreement recognizing Local 703 and Local 707 as joint bargaining agents of the companies' employees, although Local 703 had been functioning under contract as the exclusive bargaining agent until that time. The memoranda provided that either union would become the exclusive bargaining agent in the event that the other union disclaimed interest in representing the employees.
 
 
 16
 Local 703 obtained signatures endorsing the memoranda from employees of each company on an "Authorization Petition," which stated that the employees designated Local 707 to act as their collective bargaining agent, either jointly or separately. Union representatives obtained the signatures during the employees' working hours. Some employees were told that the petition was to protect Local 703's officers and to retain control of the union in the face of a RICO suit pending against the IBT. Other employees were told that the petition was to protect Local 703 from hostile forces threatening the union and that, if the employees did not sign, the government would seize their severance and retirement funds. Local 707 presented the signatures to the companies, who quickly signed the memoranda.
 
 
 17
 On October 4, less than one week after each company signed the memoranda, Local 703 drafted a "Disclaimer of Interest," stating that Local 703 would no longer represent the employees of the companies and that Local 707 would succeed as the exclusive bargaining agent for the employees. The disclaimer was signed by the majority of Local 703 officers, and Local 707 represented itself as the exclusive bargaining agent for each company.
 
 
 18
 Local 703 disclaimed interest on the same day the IBT placed Local 703 under trusteeship. The IBT felt that the trusteeship was necessary because Local 703 officers had violated their oath of office and the IBT's constitution by transferring bargaining rights to a non-Teamsters union, Local 707. The trustee personally notified Local 703 of the trusteeship on October 5 and directed the executive board to post notice of the trusteeship in every place where Local 703 had a bargaining contract. Local 703 ignored this order, however, and asked the companies to remit dues to Local 703 as a "division" of Local 707. The companies began deducting monthly dues from employees' wages and forwarding them to Local 707. The dues went to Local 707's treasury, and officers of Local 703 were paid from Local 707's account.
 
 
 19
 Meanwhile, on October 9, the trustee wrote a letter to all Local 703 members which, in relevant part, stated:
 
 
 20
 1. No matter what anyone has told you, you are a member of Local 703 and only Local 703 is your collective bargaining agent.
 
 
 21
 * * * * * *
 
 
 22
 3. No officer or business representative in place as of October 4, 1990, has any authority to act or speak for Local 703. Until further notice, any grievance or question should be made directly to me....
 
 
 23
 Under the International Constitution, as Trustee I have complete control and authority over all of the assets and administration of Local 703 including without limit the authority to sign checks, remove officers, business representatives and employees and appoint successors, and negotiate and administer collective bargaining agreements including grievances.
 
 
 24
 * * * * * *
 
 
 25
 Again, do not let anyone confuse you about your membership. You are a member of Local 703 only, and I will take all legal action on behalf of Local 703 to ensure it.
 
 
 26
 (emphasis in original).
 
 
 27
 On October 12, the trustee held another meeting with the executive board of Local 703. Upon discovering that the board of Local 703 was still diverting union membership to Local 707, the trustee fired the board and directed them to return any Local 703 property in their possession. On October 15, Local 707 hired all discharged Local 703 executive board members and gave them job titles similar to their former titles in the newly created "Local 703, as a division of Local 707."
 
 
 28
 Subsequently, Local 703 filed with the Board the underlying unfair labor charges against Local 707 and the companies. On March 29, 1991, the Board's regional director filed a consolidated complaint against Local 707 and the companies alleging unfair labor practices. The ALJ heard evidence and wrote an extensive opinion, which the Board adopted with very minor changes. The Board found that the companies violated Sections 8(a)(5) and (1), 8(a)(2) and (1), and 8(a)(3) and (1) of the National Labor Relations Act, and that Local 707 violated Sections 8(b)(1)(A) and 8(b)(2) of the Act. The Board also found that Local 707 did not represent an uncoerced majority of employees in each unit.
 
 
 29
 The Board's order requires the companies and Local 707 to stop engaging in unfair labor practices and to recognize Local 703 as the exclusive bargaining agent for employees of the companies. The order also holds the employers and Local 707 jointly and severally liable to Local 703 with interest for union dues and fees checked off and remitted to Local 707. This case is before us on the Board's application to enforce its order. Local 707 has filed a cross-petition for review. Furthermore, the companies have requested that this Court clarify the Board's decision and hold Local 707 primarily liable and the companies secondarily liable.
 
 II. Discussion
 
 30
 We have jurisdiction to consider the Board's application under 29 U.S.C. Sec. 160(e), which also provides the appropriate standard of review. We will uphold the Board's determination if its factual findings are supported by substantial evidence in the record as a whole and if its legal conclusions have a reasonable basis in the law. NLRB v. Shelby Memorial Hosp. Ass'n, 1 F.3d 550, 554 (7th Cir.1993). Therefore, we will uphold the Board's legal conclusions unless they are irrational or inconsistent with the National Labor Relations Act. Id. at 555.
 
 1. The Contract Bar Rule
 
 31
 On appeal, the sole issue raised by Local 707 is whether the Board erred in concluding that the contract bar rule prohibited the employers from transferring recognition from Local 703 to Local 707. Under the contract bar rule, a collective bargaining agreement protects an existing bargaining relationship from challenge for the contract term. The Board will generally refuse decertification elections, whether requested by the employer, the employees or another union, for the life of the bargaining contract. Westwood Import Co. v. NLRB, 681 F.2d 664, 666 (9th Cir.1982); Pioneer Inn Assocs. v. NLRB, 578 F.2d 835, 838 (9th Cir.1978). The rule also bars employers from repudiating the contract or withdrawing recognition of a union for the contract term. NLRB v. Marine Optical, Inc., 671 F.2d 11, 16 (1st Cir.1982).
 
 
 32
 Under the rule, a valid contract not exceeding three years in duration will bar a representation election unless a petition is filed more than 60 and less than 90 days before the end of the contract. Bob's Big Boy Family Restaurants v. NLRB, 625 F.2d 850, 851 (9th Cir.1980). If the contract term exceeds three years, a petition will be dismissed if it is outside the 60 to 90 day period preceding the contract's third year, even if the petition is filed between 60 and 90 days before the final expiration date. Id. The 60 to 90 day period is strictly construed, id., and the rule applies "even if a majority of the employees represented by the union withdraw their support." El Torito-La Fiesta Restaurants, Inc. v. NLRB, 929 F.2d 490, 492 (9th Cir.1991) (quoting Pioneer Inn, 578 F.2d at 838).
 
 
 33
 The contract bar rule is not statutorily or judicially mandated, but is a creation of the Board. El Torito, 929 F.2d at 493. This rule "was formulated by the Board in an effort to reconcile the NLRA's goals of promoting industrial stability and employee freedom of choice." Bob's Big Boy, 625 F.2d at 851. Therefore, the Board has "substantial discretion in deciding whether to apply the rule in a particular case and in formulating the contours of the rule." NLRB v. Mississippi Power & Light Co., 769 F.2d 276, 280 (5th Cir.1985); NLRB v. Circle A & W Products Co., 647 F.2d 924, 926 (9th Cir.) ("the Board has formulated the rule and thus has the principal discretion to waive or apply it in order to effectuate its policy underpinnings."), cert. denied, 454 U.S. 1054, 102 S.Ct. 600, 70 L.Ed.2d 590 (1981). Once the Board applies the rule, its findings are conclusive if supported by substantial evidence on the record as a whole, 29 U.S.C. 160(e), and a reviewing court may not displace the Board's order even if it would have made a different choice were the matter before it de novo. NLRB v. Walton Mfg. Co., 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962).
 
 
 34
 Under the contract bar rule, Local 703's majority status could be challenged by the bargaining unit employees or another union only during the time period allowed under the rule. Neither the employees nor Local 707 could challenge Local 703's majority status at Dominick's, Donna's Distribution or Mavo Leasing except during October of 1989, or at Certified except during January of 1991 and January of 1994.
 
 
 35
 The Board properly found that Local 707 and the companies violated the contract bar rule because they granted joint recognition to Local 703 and Local 707 on September 28, 1990 and transferred exclusive recognition to Local 707 on October 4, 1990, even though the contract bar rule precluded the companies from doing so at that time. The companies were required to ignore the transfer of representation and to adhere to their contracts with Local 703: "Had they done so, great mischief would have been avoided." ALJ op. at 23.
 
 
 36
 The Board has recognized a limited number of exceptions to the contract bar rule in the past, see, e.g., El Torito, 929 F.2d at 493 (exception recognized where an employer resumes operations with new employees after an extended period of closing); Bob's Big Boy, 625 F.2d at 852 (exception recognized where bargaining contracts illegally discriminate against non-union employees), but Local 707 does not argue that any of these well-recognized exceptions apply here. Instead, Local 707 submits three alternative arguments to rebut the Board's application of the contract bar rule. First, Local 707 contends that the parties had the inherent authority to modify the collective bargaining agreement. Second, Local 707 argues that Local 703 is estopped from challenging the validity of the memoranda of agreement. Third, Local 707 argues that Local 703 waived any rights to assert a contract bar argument.
 
 
 37
 Local 707's first argument fails because it directly contradicts the purpose of the contract bar rule. Local 707 argues that Local 703, as the bargaining agent of the companies' employees, had the inherent authority to amend or modify the collective bargaining agreement. However, while the modification of most contract terms does not raise a question of representation, a change in the bargaining agent affects the very essence of the bargaining agreement. Allowing such a change would frustrate the purpose of the contract bar rule--to ensure stability in industry and in collective bargaining contracts. Under Local 707's argument, the rule itself would become meaningless, and all efforts to provide stability in collective bargaining agreements would be wasted.
 
 
 38
 Furthermore, even if Local 703 did have the authority to modify the contract despite the contract bar rule, which we hold they did not, there are additional difficulties with the execution of the memoranda of agreement and the disclaimer of interest. First, the memoranda never represented an uncoerced majority. The employee signatures were obtained at work amid threats that they would lose their pensions and insurance benefits if they did not sign. Local 707 did not rebut the Board's finding that the memoranda did not represent an uncoerced majority, and the record supports such a conclusion. Recognition of a union that does not represent a majority of unit employees violates the Act. International Ladies' Garment Workers U. v. NLRB, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961).
 
 
 39
 Furthermore, the officers of Local 703 and Local 707 acted ultra vires when they transferred recognition to Local 707, and thus the memoranda of agreement, disclaimer of interest, and dues check-offs were all void. The constitution of the International Teamsters prohibits all "members, officers, elected business agents, [or] local unions" from engaging in "secession, or fostering the same." ALJ op. at 27. In addition, the bylaws of Local 703 state, in pertinent part, that:
 
 
 40
 No member shall engage in dual unionism or espouse dual unionism or disaffiliation; or be a party to any activity to secure the disestablishment of the Local Union as a collective bargaining agent for any employee.
 
 
 41
 ALJ op. at 27. When they requested the companies and employees to sign the memoranda, the officers of Local 703 violated their bylaws by practicing "dual unionism" in granting joint recognition to Local 703 and Local 707. The disclaimer of interest violated the International Teamsters' constitution by fostering secession of Local 703 from the IBT and violated the bylaws of Local 703 by advocating disaffiliation. Furthermore, the officers of Local 703 drafted the disclaimer of interest while the local was under trusteeship and they thus lacked the authority to disclaim its interest in representation. Therefore, as the Board found, the process of transferring recognition from Local 703 to Local 707 was void ab initio.
 
 
 42
 Local 707 next asserts estoppel, but this argument also is unavailing. Local 707 argues that when Local 703 induced each company to recognize Local 707, it gave the impression that the contract bar rule did not apply. Local 707 claims that Local 703 intended the companies to rely on recognition of Local 707 by executing the memoranda of agreement, by securing signatures, and by checking off dues to Local 707, and that Local 703 is therefore estopped from asserting application of the contract bar rule.
 
 
 43
 In order to apply the doctrine of estoppel, a party must show lack of knowledge of the misrepresentation, a good faith reliance upon the misleading conduct of the party to be estopped, and detriment or prejudice from such reliance. NLRB v. J.D. Indus. Insulation Co., 615 F.2d 1289, 1294 (10th Cir.1980). "Historically, estoppel is an equitable remedy for unfairness which would result from the application of strict legal principles." Id. at 1292.
 
 
 44
 Local 707 cannot successfully argue a lack of knowledge of a misrepresentation by Local 703 or a good faith reliance on that alleged misrepresentation. The Board found that the officers of Local 703 were acting ultra vires in attempting to transfer representation to Local 707. The Board also found that Local 707's culpability was derived from the actions of Joseph and other members of the Senese faction who were members of Local 703 and were also acting as agents of Local 707. The Board's conclusion is further buttressed by the actions of the officers of Local 707 themselves: when the trustee of Local 703 fired all of Local 703's officers, Local 707 immediately hired all the officers and gave these officers positions similar to those held with Local 703. The Board's conclusion that Local 703 acted ultra vires and Local 707 lacked good faith is supported by substantial evidence. Thus, the doctrine of estoppel does not apply.
 
 
 45
 Finally, Local 707 claims that the parties to a contract can mutually waive the benefit of the contract bar rule, noting that it was Local 703 that pursued the change in representation, not Local 707. We do not need to reach the issue of whether it is possible to waive the contract bar rule here, however, because, as our discussion regarding modification of the contract explains, the officers of Local 703 clearly were acting ultra vires when they attempted to transfer control to Local 707. Thus, because the officers of Local 703 did not have the authority to effect this change, it was not possible for them to waive the contract bar rule in this case.
 
 
 46
 2. Primary and Secondary Liability of the Companies
 
 
 47
 The Board held the companies and Local 707 jointly and severally liable for reimbursement of the dues transferred to Local 707. The companies have requested that the court hold Local 707 primarily liable and the companies only secondarily liable. The companies note that Local 707 is in possession of the dues, and should therefore bear the primary burden of repayment.
 
 
 48
 We cannot reach the merits of this request. Section 10(e) of the National Labor Relations Act states that: "No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C.A. 160(e); see also Woelke & Romero Framing, Inc. v. NLRB, 456 U.S. 645, 665-66, 102 S.Ct. 2071, 2083, 72 L.Ed.2d 398 (1982).
 
 
 49
 Rule 10(e) ensures that the Board will have a chance to review all issues that may arise in a subsequent review of its decision. Congress enacted Rule 10(e) "to ensure that a court does not review any determination of the Board without receiving full benefit of the Board's expertise." Prairie Tank Southern, Inc. v. NLRB, 710 F.2d 1262, 1266 (7th Cir.1983). Section 10(e) "serves the salutary policy ... of affording the Board opportunity to consider on the merits questions to be urged upon review of its order." Marshall Field & Co. v. NLRB, 318 U.S. 253, 256, 63 S.Ct. 585, 87 L.Ed. 744 (1943).
 
 
 50
 Written exceptions are necessary to preserve any issue for appeal, Retail Clerks Int'l Ass'n, AFL-CIO v. NLRB, 366 F.2d 642, 647 (D.C.Cir.1966), and the requirements of Section 10(e) are strictly construed. NLRB v. Izzi, 343 F.2d 753, 755 (1st Cir.1965). Raising an issue to an agent of the Board, such as a Hearing Examiner, is not sufficient if no written exceptions are filed with the Board. Kovach v. NLRB, 229 F.2d 138, 143 (7th Cir.1956). Any other position would undermine Rule 10(e), because the Board would no longer be free to consider only issues raised in formal exceptions if the court were to hear every objection made to any agent of the Board. Id.; accord NLRB v. Mooney Aircraft, Inc., 310 F.2d 565 (5th Cir.1962) (where respondent filed no written exceptions with the Board, objections made during a telephone conversation with a Board attorney were not sufficient to raise the issue before the Board).
 
 
 51
 The companies concede that no exceptions were filed with the Board, but Dominick's asserts that at the time it elected not to file exceptions to the ALJ's decision, it advised the Board's compliance staff that holding it secondarily liable would be consistent with the Board's previous practice. However, these oral objections to the compliance staff (an agent of the Board) are insufficient to create jurisdiction. Finding jurisdiction in this case would undermine 10(e)'s purpose of providing the Board with an opportunity to address potential issues on review of its decision.
 
 
 52
 Further, we have not found extraordinary circumstances in this case. For Rule 10(e) purposes, extraordinary circumstances exist "only if there has been some occurrence or decision that prevented a matter which should have been presented to the Board from having been presented at the proper time." NLRB v. Allied Prod. Corp., Richard Bros. Div., 548 F.2d 644, 654 (6th Cir.1977). There is no evidence that any event prevented the companies from raising the question to the Board in this case. Because the companies failed to raise the issue before the Board and because there are no extraordinary circumstances to warrant our taking jurisdiction, we cannot reach the merits of the primary-secondary liability issue, although we note that it is the general policy of the Board to seek "full reimbursement of dues paid from the party who was the ultimate recipient of the funds....", Hermet, Inc., 222 NLRB 29 n. 1 (1976), as counsel for the NLRB conceded at oral argument.
 
 Conclusion
 
 53
 For the reasons cited above, the Board's application for enforcement of its order is GRANTED and all objections to the National Labor Relations Board's order are DENIED.
 
 
 54
 ENFORCED.
 
 
 
 *
 The Honorable Hubert L. Will, District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 Truck Drivers Local 707 NPWU, based in Chicago, is the only local of the four involved in this appeal