**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SHELBY MEMORIAL HOSPITAL AS-SOCIATION, d.b.a. Shelby Memorial Home, Respondent.**

Nos. 92–1285, 92–2368.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 2, 1992.

Decided Aug. 2, 1993.

had incurred a concrete detriment in return for Artisoft's promise to make him its Director of Sales.

Elizabeth Kinney, N.L.R.B., Chicago, IL, Aileen A. Armstrong, Peter D. Winkler, Vincent Falvo (argued), N.L.R.B., Appellate Court, Enforcement Litigation, Washington, DC, Joseph H. Solien, N.L.R.B., St. Louis, MO, for petitioner.

Brian J. Fahey, Mark D. Nelson, Keck, Mahin & Cate, Chicago, IL, Joseph A. Yocum (argued), Evansville, IN, for respondent.

Before MANION and KANNE, Circuit Judges, and WILL, Senior Circuit Judge.[*]

KANNE, Circuit Judge.

The National Labor Relations Board (NLRB or Board) seeks enforcement of two orders against Shelby Memorial Hospital Association, doing business as Shelby Memorial Home (Home). The cases in which the orders issued were consolidated for disposition by this court. For the reasons that follow, we grant enforcement of both orders.

## I. Background

Shelby Memorial Hospital operates Shelby Memorial Home, a skilled nursing home in Shelbyville, Illinois. In the main, the facility's employees consist of registered nurses (RNs), licensed practical nurses (LPNs), and certified nurse's aides (CNAs). These individuals are classified as either full-time, part-time, or on-call employees. The twenty-four hour work day at the Home is divided into three shifts.[1] An administrator, director of nursing, maintenance supervisor, and various department heads constitute the Home's supervisory staff.

In early summer 1990, nurses at the Home began a union drive. The Home unsuccessfully opposed the union. The first case heard by the Board arose when, in July 1990, an affiliate of the International Brotherhood of Teamsters and Home employee LPN Michelle Sands filed charges of unfair labor practices against the Home. From April 1–3, 1991, a NLRB administrative law judge (ALJ) conducted hearings on the consolidated cases stemming from these charges. The ALJ issued a decision on July 15, finding that numerous actions of the Home in re-

sponse to the union organizing campaign violated § 8(a)(1), (3), and (4) of the National Labor Relations Act (NLRA or Act), codified at 29 U.S.C. § 158(a)(1), (3), and (4).[2] A three-member panel of the NLRB affirmed the ALJ's findings and conclusions, and adopted his recommended order.[3] We refer to this order as the "first order." The Board filed an application for enforcement in this court on February 5, 1992; a week later, the Home filed a timely answer.

In a separate case, the Teamsters affiliate filed unfair labor practice charges against the Home based specifically on its treatment of LPN Sands. The matter was heard before an ALJ on October 17, 1991. The ALJ found that the Home's treatment of Sands violated § 158(a)(1), (3), and (4). A panel of the Board affirmed the ALJ's determinations and adopted his recommended order.[4] We refer to this order as the "second order." The Board filed an application for enforcement in this court on June 10, and the Home made a timely answer. On April 15, this court issued an order consolidating the enforcement applications for the first and second orders.

## II. Standard of Review

 We have jurisdiction to consider the Board's petitions for enforcement under 29 U.S.C. § 160(e), which also governs our standard of review. "We must uphold the Board's determination if its factual findings are supported by substantial evidence in the record as a whole and its legal conclusions have a reasonable basis in the law." *NLRB v. Augusta Bakery Corporation,* 957 F.2d 1467, 1471 (7th Cir.1992). *See also United*

---

[*] The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. We adopt the ALJ's designation of these shifts as the 7 a.m. to 3 p.m., 3 p.m. to 11 p.m., and 11 p.m. to 7 a.m. shifts.

2. 29 U.S.C. § 157 provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations...." 29 U.S.C. § 158(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" § 157. Section 158(a)(3) makes

it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization...." Section 158(a)(4) makes it an unfair labor practice "to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under" the NLRA.

3. *Shelby Memorial Hospital Association,* 1991 WL 280338 (1991).

4. *Shelby Memorial Hospital Association,* 1992 WL 77796 (1992).

*States Marine Corporation v. NLRB*, 944 F.2d 1305, 1313–14 (7th Cir.1991) (en banc), *cert. denied*, —— U.S. ——, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992). Substantial evidence "means such relevant evidence that a reasonable mind might accept as adequate to support" the Board's determination. *Universal Camera Corporation v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951). *See also Roadmaster Corporation v. NLRB*, 874 F.2d 448, 452 (7th Cir.1989).

 The narrow scope of our review "does not allow us to dabble in fact-finding, and we may not displace reasonable determinations simply because we would have come to a different conclusion if we reviewed the case de novo." *NLRB v. P*I*E Nationwide, Inc.*, 923 F.2d 506, 513 (7th Cir.1991). *See also Lapham–Hickey Steel Corporation v. NLRB*, 904 F.2d 1180, 1184 (7th Cir.1990). Accordingly, we must uphold the Board's legal conclusions unless they are irrational or inconsistent with the National Labor Relations Act. *Aqua–Chem, Inc., Cleaver–Brooks Division v. NLRB*, 910 F.2d 1487, 1490 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2871, 115 L.Ed.2d 1037 (1991). Moreover, we will not disturb the Board's remedial order "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Electric & Power Company v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). *See also Fibreboard Paper Products Corporation v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964).

### III. *Analysis*

The Home argues that several of the Board's findings should not be enforced because they are not supported by substantial evidence in the record as a whole. In short, the Home insists that while it opposed the union, its actions with respect to individual employees were motivated by financial concerns at a time when the facility was losing money. We address the Home's arguments in roughly the same order they are raised in the briefs, beginning with the first order.

### A. *The First Order*

#### 1. Affirmative Remedies

As part of its benefits program for nurses, the Home offered tuition assistance to CNAs who desired to attend nursing school. Under the arrangement, the Home would pay approximately three-quarters of a CNA's tuition in exchange for that individual's promise to work for the Home for two years following graduation. On June 10, 1990, Home's Director of Nursing, Joyce Turpin, informed CNAs Karen Endsley and Stewart Edersheim that they had been accepted into Home's tuition assistance program.

In late June, three employees of the Home contacted the International Brotherhood of Teamsters to inquire about organizing a union. A meeting between Home employees and a Teamsters representative was scheduled for July 5 at a local public park. On June 25, Nursing Director Turpin told CNA Edersheim that the Home would be unable to send him and CNA Endsley to nursing school because to do so could be construed as trying to influence their votes on the union. Turpin added that previously scheduled wage increases for the two CNAs had been postponed for the same reason. This action ran counter to the Home's policy, since 1989, of granting a raise on an employee's anniversary date following a satisfactory job evaluation.[5] At the hearing before the ALJ, LPN Lisa Standefer testified that she overheard the conversation between Turpin and Edersheim, and that Turpin had said tuition assistance and wage increases would be "considered a bribe."[6]

---

5. Albert Wimer, the Home's Administrator until January 1, 1991, testified before the ALJ that, prior to 1989, the Home administered percentage wage increases across the board to its employees. In 1989, after Dan Colby took over as Chief Executive Officer of the hospital affiliated with the Home, the policy was changed so that raises were based on merit and awarded annually on the individual employee's anniversary date.

6. The record discloses that a number of the Home's nurses, including LPNs Deanna Bly and Marlena Pritzman, were told that wage increases were being withheld because they would be considered a bribe to employees.

Edersheim and Endsley were among the Home's employees who attended the July 5 union meeting, and both signed union authorization cards. On July 10, the Teamsters Union filed with the NLRB a petition for a union representation election at the Home. On July 30, CNA Endsley asked Nursing Director Turpin about her raise, which had been due the previous March, as well as about the Home's prior commitment to assist her with nursing school tuition. Turpin responded that the raise and assistance had been "put on hold because of the union." Endsley started nursing school the following September, paying her own way.[7] Also in September, Edersheim spoke with Home Administrator Albert Wimer and was told that he could not receive tuition assistance because it would be viewed as an attempt to influence his vote in the union election. In October, Edersheim quit. The next month, the Home granted raises retroactive to each employee's starting date, although some employees, including Edersheim and LPN Feldpouch, never received one.

On the basis of these facts, the Board found that the Home violated § 158(a)(1) by informing CNAs Edersheim and Endsley that their annual raises were being withheld, and the offers of tuition assistance rescinded, because of their union activities. The Board noted that it has found a violation of the NLRA where an employer refuses to follow an established practice of assisting employees in attending seminars or receiving job training because of the employees' union activities, citing *St. Francis Hospital*, 1982 WL 24751 (1982), *enforced*, 729 F.2d 844 (D.C.Cir. 1984), and *The Norwalk Hospital*, 1979 WL 9968 (1979). The order adopted by the Board requires the Home to reimburse Endsley for the cost (including interest) of attending nursing school to the extent other employees were reimbursed under the tuition assistance program. In addition, the Home must pay Edersheim the annual raise he did not receive (also including interest). The Home argues that these affirmative remedies are inappropriate.

Congress has charged the Board with "the task of devising remedies to effectuate the policies of the Act." *NLRB v. Seven–Up Bottling Company*, 344 U.S. 344, 346, 73 S.Ct. 287, 289, 97 L.Ed. 377 (1953). Accordingly, "[i]t is for the Board not the courts to determine how the effect of prior unfair labor practices may be expunged." *International Association of Machinists v. NLRB*, 311 U.S. 72, 82, 61 S.Ct. 83, 89, 85 L.Ed. 50 (1940). *See also NLRB v. Gissel Packing Company*, 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547 (1969). The Board's authority to fashion remedies "is a broad discretionary one, subject to limited judicial review"; we only consider whether the remedial order attempts to effectuate the policies of the NLRA. *Fibreboard Paper Products Corporation*, 379 U.S. at 216, 85 S.Ct. at 406. *See also United States Marine Corporation*, 944 F.2d at 1314.

With respect to the remedy awarded to Endsley, the Home does not contest the Board's finding that the rescission of the offer of tuition assistance violated the NLRA, accordingly that finding is entitled to summary affirmance. *United States Marine Corporation*, 944 F.2d at 1314–15. *See also NLRB v. Jakel Motors, Inc.*, 875 F.2d 644, 645 (7th Cir.1989). The Home argues only that the remedy is inappropriate because Endsley's voluntary departure in November 1990 made it impossible, under the terms of the tuition assistance policy, for her to honor her two-year commitment to work for the Home. According to the Home, it would have been impossible for Endsley to satisfy this requirement because she quit working and was later rehired.

■ This argument is without merit. The Board noted that a student's two-year obligation to the Home begins after completion of his or her nursing studies. A copy of the written tuition agreement used by the Home, entered in the record as "Joint Exhibit 1," supports this view. The agreement states that the two-year commitment applies to full-time employment at the Home "immediately *following completion* of nursing school" (em-

---

**7.** Endsley continued to work at the Home until Thanksgiving, when she quit. She was rehired on January 19, 1991.

phasis added). Under the terms of the agreement, the Home will make payments "to [the] student each quarter or semester as appropriate"; in return, the student, for his or her part, must sign and deliver a promissory note to the hospital. If the student successfully completes nursing school and works for the Home for two years, "then the entire scholarship loan and interest shall be forgiven."

The Board's order requires the Home to provide Endsley with tuition assistance "to the extent [the Home] reimbursed other employees for their nursing school costs before the involved union organizing drive," including interest. Before Endsley left the Home's employ in late November 1990 she had started nursing school, paying her own way because the Home would not honor its previous commitment to her.

We conclude that the Board's remedy properly attempts to restore Endsley to the position she would have occupied had the Home not unlawfully withheld promised benefits. At the time oral argument was heard in these cases, Endsley was still employed by the Home. Presumably she finished (or will finish) her studies during the course of her employment. Accordingly, the Home must provide Endsley with the tuition payments it should have made when she began nursing school in September 1990, though it can require her to sign a promissory note in order to protect its investment and to encourage her post-graduate employment at the Home. Adding interest to the amount Endsley is due merely accounts for the time value of money and insures that she is fully reimbursed for the costs she incurred.

The Home objects that, because the Board did not direct it to reimburse Edersheim, whose offer of tuition assistance was also rescinded because of his union activities, reimbursement to Endsley is inappropriate. This argument makes little sense. Endsley remains employed by the Home, Edersheim does not. Moreover, there is no evidence in the record that Edersheim, while still in the Home's employ, began nursing school paying his own way. Contrary to the Home's argument, there is nothing inconsistent in requiring that a particular remedy be awarded to a current employee, but not to a former one. Inasmuch as it seeks to return Endsley to the status quo, the Board's order of retroactive tuition assistance passes this test. *See Gissel Packing Company*, 395 U.S. at 612, 89 S.Ct. at 1939.

The Home argues next that it should not be required to give CNA Edersheim, who worked at the Home from April 1988 until his voluntary departure in October 1990, a retroactive pay raise as required by the Board. The Board's order states that the Home must

> [m]ake whole Stewart A. Edersheim, and any other employee denied a timely raise, for the retaliatory denial of wage increases by making payments of a sum of money equal to that which they would have earned had [the Home] not engaged in ... unlawful action[,] with backpay and interest thereon....

The Home asserts that it awarded wage increases effective September 1, 1990, retroactive to the individual employee's anniversary date, and that "[s]ince Endersheim [sic] left in October it seems most difficult to conclude that he should receive a pay increase not effective until after he left." Whether or not the wage increase became effective after Edersheim left the Home's employ, the evidence is undisputed that he never received the wage increase that was withheld because of his union activities.

▪ Before reaching the issue of the propriety of the Board's remedy as to Edersheim, however, we must first address the Home's argument that it did not violate the NLRA by withholding wage increases during the summer of 1990 because it was concerned that such conduct would be perceived as an improper attempt to influence the union representation vote held on October 3 of that year. Withholding regularly scheduled benefits during a union campaign can violate § 158(a)(1) and (3) of the Act. *NLRB v. Don's Olney Foods*, 870 F.2d 1279, 1285 (7th Cir.1989). *See also NLRB v. Industrial Erectors, Inc.*, 712 F.2d 1131, 1135 (7th Cir. 1983); *NLRB v. Lucy Ellen Candy Division of F & F Laboratories, Inc.*, 517 F.2d 551,

554 (7th Cir.1975). In *Don's Olney Foods,* we stated that

> [i]n order not to unfairly influence a union election, the employer must maintain the pre-union *status quo* respecting employee benefits, viewed dynamically; that is, expectations of upcoming benefits created by the employer either by promises or through a regular pattern of granting benefits cannot be disappointed without proof of a union-neutral justification.

870 F.2d at 1285.

The Home maintains that the Board's holding in *Retlaw Broadcasting,* 1991 WL 69703 (1991), provides such a justification. In that case, employees were told that suspension of their annual evaluations and corresponding wage increases was based on the advice of the employer's attorney that to continue the evaluations could be considered unlawful interference in a union representation election, and that the employer would reinstate the program as soon as it was advised it was legal to do so. The Board ruled that an employer could suspend employee evaluations and raises on the advice of its attorney during a union organizing campaign, and even during the employer's appeal of the results of the subsequent election. In fashioning this rule, the Board relied on *Atlantic Forest Products,* 1987 WL 90186 (1987), which holds that an employer can postpone a wage adjustment so long as it makes clear to employees that the adjustment would be awarded whether or not they select a union, and that the sole reason for the postponement is to avoid the appearance of influencing the outcome of the representation election.

It is clear that neither *Retlaw* nor *Atlantic Forest* helps the Home in this case. The Home concedes that it told employees that wage increases were being withheld because of union activity but never informed them that the raises would be reinstated regardless of the outcome of the union election. Indeed, the Home breathed nary a word that the raises, even for those employees whose anniversary dates preceded the union campaign,[8] would ever be awarded. Thus, we conclude that the Board's finding that the

Home unlawfully postponed wage increases is supported by substantial evidence. Moreover, we conclude that the Home's decision to award raises retroactively does not cure the violation with respect to Edersheim because he never received one. The violation of the Act occurred while Edersheim was an employee of the Home. The Board's order that he is entitled to the wage increase he would have received had it not been unlawfully withheld, with interest on that amount, is appropriate.

### 2. Interrogation of Employees

Christina Welton worked in the Home's dietary department. She attended the July 5 union organization meeting and signed a union authorization card. At the hearing before the ALJ, she testified that, the day after the meeting, Dietary Supervisor Mildred Fisher took her aside at work and asked whether she or anyone from the dietary department had attended the meeting. Welton denied any knowledge of the meeting.

Before the ALJ, Fisher denied having any conversation with Welton about the union meeting, admitting only that she had heard from other employees that Welton, Welton's mother LPN Judy Read, and LPN Brenda Toothman had attended. Fisher also testified that she and other supervisors were advised by Home Administrator Wimer at a meeting of department heads as to what could and could not be said to employees about the union.

The Board found that the questioning of Welton constituted unlawful interrogation in violation of § 158(a)(1). The Board credited Welton's testimony over that of Fisher because Welton was no longer employed by the Home at the time of the hearing and had nothing to gain by testifying falsely about the incident. In contrast, the Board did not consider Fisher to be a credible witness, finding that she did not specifically deny Welton's story, but instead gave "brief responses to carefully couched questions" during direct examination. Moreover, Fisher's credibility was weakened by her admission on cross-examination that the meeting with

---

**8.** For example, CNA Endsley's anniversary date was in March.

Administrator Wimer did not occur until after the July 5 union meeting.

George Hopkins worked as a janitor for the Home. In April 1990, as a result of the financial problems the Home was then experiencing, he was laid off. He was subsequently rehired in late June. Following his return, Hopkins attended the July 5 meeting and signed an authorization card. He testified before the ALJ that, on July 15, five days after the Teamsters Union had filed an election petition, Richard Carlson, the Home's Maintenance Supervisor, approached him at work and said: "I've got to ask you this question. You can tell me if it's none of my business if you want to. Has [sic] any of the nurses or aides harassed you about the union?" Hopkins said no. Carlson denied initiating a conversation with Hopkins about the union. Rather, he testified at the administrative hearing that Hopkins asked him about the union, and that he told Hopkins he had a right to vote on the matter as he saw fit.

The Board credited Hopkins's version of events, noting that he, like Christina Welton, was not employed by the Home at the time and had nothing to gain by fabricating his testimony. Consequently, the Board concluded that Carlson unlawfully interrogated Hopkins in an attempt to elicit the names of employees who had spoken with him about the union.

■ The Home challenges the Board's findings with respect to both Welton and Hopkins. We begin our discussion with an overview of the law and the nature of our review. Coercive interrogation of an employee about his union sentiments can violate § 158(a)(1) of the NLRA. *NLRB v. Berger Transfer & Storage Company,* 678 F.2d 679, 689 (7th Cir.1982); *NLRB v. Rich's Precision Foundry, Inc.,* 667 F.2d 613, 624 (7th Cir.1981). In order to establish a violation, it need not be shown that an attempt at coercion succeeded; the test of interference with the right of self-organization is whether the employer engaged in conduct which reasonably tended to interfere with, restrain, or coerce employees with respect to union activities. *NLRB v. Almet, Inc.,* 987 F.2d 445, 451 (7th Cir.1993); *NLRB v. Ajax Tool Works, Inc.,* 713 F.2d 1307, 1313 (7th Cir. 1983) (per curiam); *Rich's Precision Foundry,* 667 F.2d at 624.

■ In determining the effect of an employer's interrogation on an employee, the court should consider, *inter alia,* the background of employer-employee-union relations, the identity and authority of the questioner, the nature of the information sought, the place and method of questioning, and the truthfulness of the reply. *Rich's Precision Foundry,* 667 F.2d at 624; *Ajax Tool Works,* 713 F.2d at 1314; *First Lakewood Associates v. NLRB,* 582 F.2d 416, 418–19 (7th Cir. 1978). These factors are not exclusive, however; in the end, the court must consider all relevant circumstances, including whether the questions were accompanied by a persuasive legitimate explanation for the employer's interest and whether the questioned employee was assured that no reprisals would follow his response. *Ajax Tool Works,* 713 F.2d at 1314.

■ Turning to the specific findings before us, we point out that the resolution of conflicting testimony is for the ALJ and the Board, and their credibility determinations will not be overturned absent extraordinary circumstances. *Augusta Bakery Corporation,* 957 F.2d at 1477; *Roadmaster Corporation,* 874 F.2d at 453 n. 4; *Richmond Recording Corporation v. NLRB,* 836 F.2d 289, 295 (7th Cir.1987). We find nothing exceptional about the Board's credibility findings, and proceed to the substantive issue of whether the questioning of Welton and Hopkins violated § 158(a)(1).

Both Welton and Hopkins attended the union meeting, both were questioned at work by their supervisors (in Welton's case, one day after the meeting; in Hopkins's case, within a week of the election petition filing), and both were questioned directly about union activity and their possible involvement. Welton did not truthfully answer Fisher's question, permitting the reasonable inference that she feared possible reprisal. *See Ajax Tool Works,* 713 F.2d at 1315.

Carlson approached Hopkins saying that he had a question, and that Hopkins could tell him it was none of his business if he

wished. The Board reasonably concluded from this statement that the Home was requiring its supervisors to ask employees about their union activities. Moreover, Hopkins had recently returned to the Home after having been laid off. It is doubtful, given the Home's financial problems during the summer of 1990 and, as a consequence, the tenuous nature of Hopkins's job security, that he believed he could take his supervisor at his word and tell him to mind his own business. That subsequently the Home took no action against either employee is irrelevant; the proper inquiry is the context of the interrogation itself. On the record as a whole, substantial evidence supports the Board's conclusions that the questioning of Welton and Hopkins amounted to unlawful interrogation in violation of § 158(a)(1).

### 3. Coercive Statements and Threats to LPNs at the July 19, 1990 Meeting

On July 18, the Home circulated the following memorandum to all employees:

THIS IS TO ADVISE YOU THAT THE NLRB HAS TENTATIVELY SET A HEARING ON WEDNESDAY, JULY 25TH, TO DECIDE WHO CAN VOTE IN A UNION ELECTION. OUR POSITION IS SUPERVISORS, RNs, AND LPNs CANNOT VOTE. WE WILL KEEP YOU ADVISED.

On July 19, the Home held a mandatory meeting for all RNs, LPNs, and supervisors. The Home's Administrator, Albert Wimer, Home attorney, Joseph Yocum, and the Chief Executive Officer of the Home's affiliated hospital, Dan Colby, conducted the meeting. Yocum told the nurses that, in the Home's opinion, all RNs and LPNs were supervisors who could not vote in the upcoming election but must remain loyal to the Home. When asked by LPN Michelle Sands, a union supporter, what he meant by "loyalty," Yocum replied that all RNs and LPNs were prohibited from engaging in union activities.

LPN Amy Feldpouch, also a union supporter, then asked if LPNs could be fired before the NLRB had determined whether or not they were supervisors. Yocum, according to Feldpouch, said yes, adding that LPNs found to be engaging in union organization could be discharged. When asked by Sands why the Home opposed the union, Yocum responded, "Well, for one thing, they cost too God damn much money.... [D]o you think those dues come out of thin air?" Feldpouch recalled that near the end of the meeting Yocum added, "Now don't get me wrong, we're not going to fire anybody." Administrator Wimer testified before the ALJ that the Home considered LPNs to be supervisors who could be discharged for engaging in union activity, though he did not recall any statement at the July 19 meeting to the effect that LPNs could be discharged before the NLRB determined their status.[9]

■ The Board concluded that the Home, through attorney Yocum, violated § 158(a)(1) by telling LPNs present at the meeting that they could not vote in the upcoming union election or participate in union activities, and that engaging in such activities could subject them to dismissal. Threatening employees with discharge, discipline, or other reprisals for engaging in union activity violates § 158(a)(1) because these actions reasonably tend to coerce employees in the exercise of their rights, regardless of whether they do, in fact, coerce. *Northern Wire Corporation v. NLRB*, 887 F.2d 1313, 1317 (7th Cir.1989). *See also NLRB v. Del Rey Tortilleria, Inc.*, 787 F.2d 1118, 1122–23 (7th Cir.1986); *Berger Transfer & Storage Company*, 678 F.2d at 690–91.

■ The Home contests the Board's findings, arguing that, as a result of the filing of a union election, it was properly concerned about the status of the LPNs and whether or not they were supervisors whose loyalty to the Home could be compelled. The July 19 meeting, the Home insists, was called merely to advise RNs and LPNs of the Home's legal

9. Subsequent to the meeting, the regional director of the NLRB found that LPNs were not supervisors within the meaning of the NLRA. As the Board pointed out in its first order, "[a]n employer acts at its peril when it takes steps calculated to chill the exercise of [§ 157] rights by individuals who may later be found to be under the protection of the Act" (citing *Sav–On Drugs*, 1980 WL 12648 (1980), *enforced*, 728 F.2d 1254 (9th Cir.1984) (en banc)).

position with regard to their status. The Home does not specifically deny that Yocum made the statements attributed to him, nor does it seriously challenge the testimony of LPNs Sands and Feldpouch. Rather the Home submits that Yocum's remarks, considered as a whole, do not amount to a violation of the NLRA. The Home points to Yocum's declaration, near the close of the meeting, that the Home was not going to fire anyone as evidence that his talk was intended neither to threaten nor coerce. The Home also claims that, before the ALJ, Administrator Wimer "testified that he heard none of the allegations stated [by the nurses] in this matter at the meeting, rather he heard statements to the effect that 'if' any employee was found by the Board to be a supervisor[,] the rights to engage in protected union activities and vote in an election would be lost."

The circumstances of the meeting support the Board's conclusion that Yocum's statements went beyond merely announcing the Home's legal position on the status of certain employees. Yocum's assurances that the Home was not going to fire anyone undercut the argument that his previous statements were not the equivalent of threats against employees who engaged in union organization activities. If Yocum had not earlier conveyed the impression that union supporters could lose their jobs, such a statement would have been unnecessary. Finally, as the Board found, Yocum's afterthought "did not result in his total withdrawal or repudia-

tion of his earlier statements" that employees could be disciplined for union activities.

Furthermore, nothing in Wimer's testimony alters the conclusion that the meeting was intended to coerce the Home's LPNs in the exercise of their right to self-organization. Contrary to the Home's summary of his testimony, Wimer stated that, in the Home's view, the LPNs were supervisors and that supervisors could be discharged for engaging in union activities. Moreover, he stated only that he did not remember any statement being made that LPNs were told they could be discharged before a final determination of their status by the NLRB.[10] At best, Wimer's testimony was a weak rebuttal to the testimony of Feldpouch, and the Board's decision to credit her on this point will stand. *See Richmond Recording Corporation,* 836 F.2d at 295. Substantial evidence supports the Board's finding that Yocum's statements violated § 158(a)(1) of the NLRA.

### 4. The August 10, 1990 Schedule

LPN Michelle Sands had worked for the Home during several intervals of time [11] and was perhaps the most visible union supporter at the facility. She testified on behalf of the union at the August 2, 1990 Board hearing to determine whether the Home's RNs and LPNs would be eligible to vote in the union election scheduled for October. Later, she filed a charge against the Home and testified at both administrative proceedings in these cases. LPN Deanna Bly attended the July

10. The following exchange took place during the cross-examination of Wimer by the General Counsel of the NLRB:

Q. Do you recall during the course of that meeting there being some discussion about the LPN's being supervisors?
A. Yes.
Q. That was the employer's position; isn't that correct?
A. That was the employer's position.

\* \* \* \* \* \*

Q. Mr. Yocum advised employees that was the employer's position?
A. Yes, sir.
Q. And was there not discussion that with employees—if these LPN's were supervisors, they could be discharged?
A. Yes. It was.
Q. Okay.
A. If my memory serves me right.

Q. Was it not also stated that they could be discharged even before a determination was made by the Labor Board at the hearing that was upcoming?
A. I can't recall that.
Q. But it was mentioned that they could be discharged?
A. If supervisors participated in union activity, that they could be discharged.
Q. Did you tell the LPN's that they were supervisors?
A. Yes. We did. In the company's view point and in my view point, they were supervisors.

11. Sands worked as a dietary aide from September 1981 to August 1982; as a CNA from September 1982 to March 1983, and from November 1983 to February 1984; and as an LPN from September 1987 to March 1988, and from March 1989 to April 1991.

25 union organization meeting and was a known union supporter.

On August 10, the Home posted a new two-week work schedule for nurses. Previously, the Home had scheduled nurses' shifts on a monthly basis. The August 10 schedule replaced a schedule that had two weeks left to run, and took LPN Sands off the full-time day shift, relegating her to on-call status.[12] Sands was placed third on the on-call list, behind two employees, LPN Rosemary Stretch (a part-time employee who had been designated as "temporary" on past work schedules) and Paula Rentfro, both of whom had less seniority.[13] Nursing Director Joyce Turpin had previously told Sands that she could work full-time on the day shift and that Stretch would work any shifts left over on an on-call basis. Prior to August 10, Stretch had been on on-call status.

Upon learning that a new schedule had been posted, Sands contacted Assistant Nursing Director Kendra White. White told Sands that she had been placed on on-call status for financial reasons, and that Stretch and Rentfro would be called in ahead of her because of their seniority as measured by the dates they were last rehired by the Home. When Sands protested that she, in fact, had greater seniority than both women, White suggested that she speak to Nursing Director Turpin. Sands responded that she did not wish to speak to Turpin because she had lied during her testimony at the August 2 Board hearing. White replied, "Look, we didn't ask for this."

Under the August 10 schedule, LPN Bly was shifted from full-time to fourth position on the on-call list, behind Sands. When asked by Bly why she had been moved, Director Turpin said only that she had used rehiring dates to establish the order on the on-call list. When Bly mentioned that she was a full-time employee while Stretch only worked part-time, Turpin responded, "That's just the way I'm doing it."

The Board determined that the Home unlawfully discriminated against Sands and Bly by removing them from their full-time day shifts and placing them on on-call status, in violation of § 158(a)(1), (3), and (4).[14] The Home argues that any schedule change relating to both employees was due to the "economic facts of life." According to the Home, the shift changes were necessitated by the Home's financial problems, not anti-union animus, and the reduced time period covered by the new schedule (two weeks instead of the usual thirty days) was a response to problems created by employees who were scheduled but did not show up for work.

As support for its argument, the Home points out that staff reductions began in 1990 prior to the advent of the union campaign, and that changes in the nursing department had been delayed until the late summer because the Home was engaged in the process of bringing its nursing department policies, schedules, and employment levels into line with state and federal regulations. The changes instituted on August 10, the Home insists, were for the purpose of allowing it to review its work schedule and to "reduce overhead." Moreover, the scheduling changes affected many employees alike, regardless of union sympathies; some union adherents were not subject to any changes whatsoever.

■ We conclude that the Board had a sufficient basis for finding that the Home violated Sands's rights under § 157. In determining whether an employer acts unlawfully, the Board may properly rely on such factors as the employer's knowledge of union activity, manifestations of anti-union animus, suspicious timing, and departures from past practice. *Rich's Precision Foundry*, 667 F.2d at 625. With respect to the Home's treatment of Sands, there was evidence of

12. Nurses on the on-call list did not work regular hours but were contacted to fill in as needed.

13. Paula Rentfro was first hired by the Home in April 1981 as a CNA. She worked off and on until March 1991. Rentfro's status is not described in the ALJ's opinion; however, the record indicates that, at the time of the new sched-ule, she was considered a part-time employee who worked during the day.

14. Specifically, the ALJ's Conclusions of Law found that the Home's treatment of Sands violated § 158(a)(1), (3) and (4), and that its treatment of Bly violated § 158(a)(1) and (3).

each of these factors to demonstrate anti-union motivation. Prior to the August 1990 posting, the Home had scheduled nurses on a monthly basis for several years. The new schedule replaced one with two weeks left to run, and placed Sands behind two part-time employees. This move contradicted the apparent policy of the Home to give preference to permanent or full-time employees over temporary ones in matters such as scheduling, shift assignments, and staff reductions.[15] Accordingly, the Board could reject the Home's argument that seniority was determined solely by the last date of hire, without regard to full or part-time status.

The Home makes much of its financial problems during the summer and fall of 1990, arguing that sustained losses resulted in its sale to another organization in June 1991. However, the Home does not explain how its monthly losses are related to the August 10 scheduling changes. As the Board noted, the Home's monthly losses went from a high of $32,759 in November 1989 to lows of $3,277 in April 1990 and $3,457 in June 1990. In its brief to this court, the Home gives loss figures for December 1990, and January and February of 1991. No figures are given for July, August, or September 1990 that might lend credence to the argument that the scheduling changes introduced on August 10 were motivated by business concerns. The failure of an employer to produce relevant evidence particularly within its control allows the Board to draw an adverse inference that such evidence would not be favorable to it. *See NLRB v. Dorothy Shamrock Coal Company*, 833 F.2d 1263, 1269 (7th Cir.1987). Certainly, in the absence of such evidence, the Board was entitled to reject the Home's proffered justification for its actions. The Board found that the Home's business justifications for the actions taken against Sands were pretextual, and substantial evidence supports that conclusion.[16]

15. The direct testimony of former Administrator Wimer supports the existence of an informal seniority policy based on full or part-time status:

Q. Now, during your tenure as administrator, did the facility have a—a seniority policy?

A. We did not have a strict seniority policy. We tried to go by seniority purposes as far as cutting back and with part-time people versus full-time people versus this sort of thing [referring to an employee's preferences for particular work times]. And going by date of employment. But we did not have a formal seniority policy, per se.

Q. Did you [follow] seniority—with relation to shift assignments?

A. We tried to. Yes.

Q. Were there situations where you would not do this?

A. It would depend on whether the individuals [sic] was a full-time person, a part-time person and their date of hire. Yeah.

Q. And if you were unable to follow seniority, would you follow any other procedures?

A. We tried to go by the employee preference.

On cross-examination, Wimer testified as follows:

Q. Well, let me ask you in a different way then. Two employees start on January 1, 1990.

A. Right.

Q. One is a temporary employee.

A. Right.

Q. The other one is a full-time employee.

A. Right.

Q. When it comes time to either make cutbacks or changes in schedules—

A. A temporary employee would get it first.

Wimer also testified that temporary and on-call employees received "basically" no benefits, with the exception of accrued vacation time. This is supported by the unrebutted testimony of LPN Brenda Toothman that, when she was working at the Home as a temporary employee, Nursing Director Turpin had told her that temporary employees accumulated no seniority rights or benefits. We think the record discloses that the Home had an established practice—one that " 'would be clearly apparent to a reasonably objective employer,' " *Don's Olney Foods*, 870 F.2d at 1285 (quoting *Gossen Company v. NLRB*, 719 F.2d 1354, 1357 (7th Cir.1983))—of giving preference to full-time employees in employment-related matters.

16. We point out that the Home's treatment of Sands subsequent to the schedule change smacks of retaliation, further supporting the Board's finding that the new schedule was intended to punish her for her union activities. Uncontradicted evidence in the record demonstrates that, once Sands was placed on on-call status, the Home made little, if any, effort to contact her to work. In addition, on November 4, 1990, when two positions on the day shift were available, Sands reapplied for a full-time position. She was not rehired until November 20; in the interim, however, the Home hired a new LPN, Nancy Miller, and used temporary employees Stretch and Rentfro to fill the full-time vacancies. Even after being returned to full-time status, Sands was removed to the on-call list in January 1, 1991, ostensibly because she was the last full-time nurse "hired" by the hospital.

Evidence of the Home's unlawful treatment of Bly is not as strong as the evidence with respect to Sands, but we find it is sufficient to support the Board's findings. The Board determined that Bly's removal from the full-time shift was intended by the Home to punish Sands. As the Board characterized it, "Bly was a casualty in [the Home's] war against Sands." [17] Regardless of whether Bly's fate was part of plan by the Home to conceal its discriminatory treatment of Sands, we find there is substantial evidence to support the finding that Bly's removal from her full-time position, only to be replaced by a temporary employee, violated her rights under § 157 of the NLRA. As discussed, the Board properly rejected as unpersuasive the Home's business justifications for any scheduling changes, and the record reflects that, once placed on on-call status, Bly received few telephone calls to work, and these either came at the last minute or consisted of messages to call back in five minutes or "forget it." This evidence is adequate to sustain the Board's finding that the Home's treatment of Bly violated § 158(a)(1) and (3).

### 5. Assistant Nursing Director Kendra White's Statement to LPN Michelle Sands

The Board found that Assistant Nursing Director White's statement to Sands ("Look, we didn't ask for this") imparted a threat that linked Sands's support for the union to her placement on the on-call list, thus constituting a separate violation of § 158(a)(1). Specifically, the Board concluded that "there can be no other interpretation except that White was saying [the Home] did not ask for the employees to organize a union and therefore the schedule change for Sands and others is what the employees deserved...." The Home challenges this finding, offering a

somewhat different, if enigmatic, interpretation of the conversation. As the Home sees it, White was merely "advising Sands of the fact [that the Home] was facing a most unusual situation in the context of financial losses, scheduling problems and administrative proceedings."

Whatever this means, we find that the Board's interpretation is supported by substantial evidence. Sands's testimony of the incident was unrefuted. White's comment arose in the context of a discussion over a scheduling change that adversely affected Sands, and was cast as a rejoinder to Sands's remark concerning the veracity of Turpin's testimony at a Board hearing. The inference drawn by the Board—that White was specifically referring to the employees' efforts to organize a union and intended to link that endeavor to unfavorable scheduling assignments—is reasonable. By suggesting a connection between union activity and a reduction in Sands's work hours, White's statement amounted to an admission that some employees were getting what the Home considered to be their just desserts.

### 6. Wearing of Union Insignia

■ In October 1990, two days before the union election, LPNs Judy Read and Lisa Standefer arrived at work wearing union patches on their uniforms.[18] Both employees were union supporters; Read had previously attended the July 5 organization meeting. Director Turpin called the women into her office and told them to remove the patches. They complied. The Home's employee handbook prohibits the wearing of pins or badges that "do not relate to better health care delivery." This rule was not, however, enforced. Thus, Standefer had previously worn a yellow ribbon on her uniform to support the armed forces, and Read had worn a

---

**17.** The NLRB's argument to this court is that Bly, who had less seniority than Sands, was deliberately placed behind Sands on the on-call list. This was done, according to the Board's counsel, because "the Home could not purport lawfully to remove Sands from full[-]time [status] without removing Bly as well." We understand the argument to be that the Home removed Bly from her full-time position in an effort to conceal its unlawful treatment of Sands.

**18.** The patches were self-adhesive, with a white field bearing a square with a check mark in it. The words "Vote Yes" also appeared. Teamster representatives had told Home employees that they could wear the patches two days before the election.

button to work on which was inscribed "Your Attitude Is Showing" without comment from nursing home management.

■ The Board found that Turpin's actions violated § 158(a)(1). We have recognized that under the rights guaranteed by § 157, employees are entitled to wear union buttons or insignia as part of a concerted activity to assist the union. *NLRB v. Mayrath Company*, 319 F.2d 424, 426 (7th Cir. 1963). *See also Republic Aviation Corporation v. NLRB*, 324 U.S. 793, 801–03, 65 S.Ct. 982, 987–88, 89 L.Ed. 1372 (1945); *NLRB v. Orr Iron, Inc.*, 508 F.2d 1305, 1308–09 (7th Cir.1975) (per curiam). This right, of course, is not unbounded; it must coexist with "the equally undisputed right of employers to maintain discipline in their establishments." *Republic Aviation Corporation v. NLRB*, 324 U.S. at 797–98, 65 S.Ct. at 985. An employer's right to prohibit organizational activity, however,

> is limited to the restriction of activities which disrupt, or tend to disrupt, production and to break down employee discipline, and does not include restriction of passive inoffensive advertisement of organizational aims and interests, i.e., the wearing of advertising insignia and buttons, which in no way interferes with discipline or efficient production...."

*Caterpillar Tractor Company v. NLRB*, 230 F.2d 357, 359 (7th Cir.1956). *See also Mayrath*, 319 F.2d at 426–27.

The Home concedes that its employees have been permitted to wear pins and insignia on their uniforms despite the rule against such items, but argues that *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978), allows health care facilities, because they require an atmosphere of tranquility, order and discipline, to place "greater restrictions on [union] activity than employers in other types of operations." [19] This latitude, the Home proposes, shielded Turpin's actions with respect to Read and Standefer.

The Home's reading of *Beth Israel* is incomplete. That case involved not the wearing of union insignia, but a rule that prohibited employees from soliciting and distributing literature except in certain designated areas of a hospital. The Supreme Court held that "the Board's general approach of requiring health-care facilities to permit employee solicitation and distribution during nonworking time in nonworking areas, where the facility has not justified the prohibitions as necessary to avoid disruption of healthcare operations or disturbance of patients, is consistent with the Act." *Id.* at 507, 98 S.Ct. at 2476.

While *Beth Israel* would support the proposition that a health care facility may prohibit the wearing of patches that reasonably tend to interfere with employee discipline or disturb nursing home residents, it clearly does not endorse selective enforcement of an otherwise valid rule against wearing insignia unrelated to health care delivery. The Home does not argue that the patches worn by Read and Standefer had the potential to disrupt the efficient and ordered delivery of resident services. As a result, the Home cannot adequately explain its sudden decision to enforce a rule against insignia that, by the Home's own admission, had been negligibly enforced in the past. The Board could reasonably conclude that Turpin deliberately selected Read and Standefer for disparate and discriminatory enforcement of the Home's rule against wearing insignia on employee uniforms.

### 7. The Home's Discriminatory Treatment and Discharge of LPN Brenda Toothman

LPN Brenda Toothman was an early and open supporter of the union. She was one of three Home employees who initially contacted the Teamsters, she organized the July 5 meeting in the park, distributed authorization cards at work, and otherwise actively campaigned for union representation.

Under the August 10 work schedule, Toothman was moved from the 7 a.m. to 3 p.m. shift, where she had worked for a year

---

**19.** In its brief, the Home refers to *Beth Israel* by name, but gives the citation to a later case dealing with substantially the same issue, *NLRB v. Baptist Hospital, Inc.*, 442 U.S. 773, 99 S.Ct. 2598, 61 L.Ed.2d 251 (1979). Our analysis and conclusions would be the same under both cases.

and a half, to the 3 p.m. to 11 p.m. shift. When she asked Nursing Director Turpin why she had been moved to an evening shift when two part-time employees, LPN Rosemary Stretch and Paula Rentfro had been given a day shift, Turpin responded that the day shift was the only one that Stretch and Rentfro had agreed to work. When Toothman reminded her that she, too, had agreed to work only the 7 to 3 shift, Turpin relied, "That's the way it is." Previously, when she worked at the Home as a temporary employee, Toothman had been told by Turpin that temporary employees accumulated no seniority rights or benefits.

On November 5, 1990, Toothman took medical leave to undergo surgery for carpel tunnel syndrome. She had taken a leave of absence the previous April for the same surgical procedure, returning afterwards to her full-time position on the day shift. Before leaving in November, she presented the Home with a medical note giving January 2, 1991 as her return date. Administrator Wimer and Turpin signed the note.

On December 27, when she was ready to return to work, Toothman presented a medical release to Florence Glenn, the Home's new Nursing Director and Turpin's replacement. Glenn told Toothman that there was no opening for her at that time and that she had relinquished all seniority rights when she took medical leave.[20] When Toothman stated that she had previously been reinstated after taking medical leave, Glenn responded that she was only following the Home's policy as set forth in the employee handbook.

On January 7, Glenn met with Toothman and handed her a job evaluation dated December 27, completed by an RN staff nurse (serving in the capacity of acting nursing director) and Administrator Wimer. Usually, nurses' evaluations were performed by the director and assistant director of nursing; Wimer had never before evaluated Toothman's job performance. The evaluation contained lower ratings than Toothman had previously received, including a substandard grade for "Attitude," even though she had not been the subject of a reprimand or disciplinary action.

During their meeting, Glenn offered Toothman a full-time position on the 3 to 11 shift. Toothman accepted, but complained that she should have been allowed to return to her position on the day shift in light of her seniority over nearly all of the LPNs working that shift. When Toothman inquired whether or not the other LPNs working the 3 to 11 shift were going to remain on that shift, Glenn replied that they were. The next day, however, the Home moved LPN Paula Beeson, who had been hired the previous summer and, consequently, had less seniority than Toothman, from the 3 to 11 to the 7 to 3 shift.

On February 11, Toothman photocopied ten resident care plans for study at home. These plans, kept in a binder located in one of the nursing facility's hallways, contain instructions pertaining to individual residents' dietary, hygienic, and therapeutic needs, and are used by nurses working the different shifts. The nurse in charge of the care plans had recently quit working for the Home, and Nursing Director Turpin, just before leaving the Home's employ herself, had instructed the LPNs how to complete the care plans in accordance with state requirements. As a result of her medical leave, Toothman had missed this training. Although her work had not yet required her to fill out a plan, Toothman decided that she should learn the proper way to write one.

Toothman's supervisor, RN Nora Smith, observed her photocopying the plans and asked what she was doing. Toothman testified that when she asked if she could take the plans home to study, Smith replied that it was all right with her. Toothman also stated that Smith told her she could purchase a book explaining how care plans should be written. Deciding that she did not need all ten plans, Toothman discarded eight of them before leaving the facility, and cut the residents' names off the remaining two.

The next day, Smith told Nursing Director Glenn that Toothman had copied the care plans. Glenn informed Bill Morgan, the

---

**20.** At the time, Toothman had more seniority than all but one LPN on the day shift.

Home's new Administrator,[21] and the two met with Toothman on February 14. Toothman admitted that she had copied the care plans and had taken two of them out of the facility. Morgan told Toothman that she had invaded the privacy of the Home's residents and discharged her.

The Board found that the Home violated § 158(a)(1) and (3) by (i) failing to reinstate her to her former, or an equal, position of employment following her medical leave of absence, (ii) giving her a poor work evaluation, and (iii) ultimately discharging her. The Home challenges only the first and third findings. We conclude that substantial evidence supports both determinations.

■■■ The Home offers no explanation for its treatment of Toothman after her return from medical leave other than to resurrect the unavailing assertion that the Home had no seniority policy, an issue addressed earlier. The Home does not dispute that Toothman had previously taken medical leave and was fully reinstated, nor does it contend that she was told, in November, that by taking leave she would forfeit her seniority rights. Moreover, the employee handbook, which Nursing Director Glenn invoked as the source of the leave "policy," supplies no justification for the Home's apparent departure from past practice; indeed, the handbook's provisions would appear to prohibit the action taken against Toothman.[22] The Board's conclusion that the Home failed to return Toothman to her former position for discriminatory reasons is supported by the evidence.

The Board found that the Home, by offering Toothman a position on the 3 to 11 shift after she returned from medical leave, discriminatorily failed to return her to a position that provided terms and conditions of employment similar to those she had previously enjoyed. In addition, the Board found that after Toothman had agreed to work on

the evening shift the Home intentionally gave her a poor work evaluation in retaliation for her union activities. The Home's brief does not address Toothman's placement on the evening shift, and only mentions the substandard evaluation to say that she was not disciplined as a result of it. Because the Home does not challenge the Board's conclusions that these actions constituted yet more transgressions of the NLRA, those findings are summarily affirmed. *NLRB v. Jakel Motors, Inc.,* 875 F.2d at 645. The uncontested violations do not disappear, however; "[t]hey remain, lending their aroma to the context in which the [contested] issues are considered." *NLRB v. Clark Manor Nursing Home Corporation,* 671 F.2d 657, 660 (1st Cir.1982).

The Home does challenge the Board's finding that it unlawfully discharged Toothman. The Home argues that, by copying resident care plans for home study, Toothman removed medical records from the facility in violation of the faculty's anti-disclosure policies as well as state and federal regulations. The Home points out that, under the provisions of the employee handbook, the Home has the authority to discharge employees who take confidential records.[23] In defense of the Home's decision, Administrator Morgan testified before the ALJ that, during his forty years in the health care field, he had never worked in a facility that allowed nurses to make copies of health care plans and take them home. Morgan also stated that he would have fired Toothman for copying the plans even if she had not engaged in union activity. Toothman's supervisor, RN Nora Smith, testified that she never gave Toothman permission to photocopy the plans. Finally, the Home submits that Toothman implicitly acknowledged her misconduct because she originally protested to Glenn and

---

**21.** Bill Morgan replaced Albert Wimer as the Home's Administrator on January 2, 1991.

**22.** The relevant section of the employee handbook reads:

> An approved leave of absence assures the employee his/her previous or a similar position at a salary not less than was received at the beginning of the leave of absence.

**23.** The handbook states:

> Any employee who, in the opinion of his supervisor or chief executive officer is guilty of disseminating confidential information concerning patients or residents, may be discharged from his position or have such other disciplinary action taken as the supervisor deems appropriate.

**568**

Morgan only that discharge was too severe a penalty.

Toothman testified that she wanted the care plans for private study and had removed the names of residents from the two copies she took with her. The Board credited this testimony over that of the Home's witnesses, finding that no breach of resident confidentiality had, in fact, occurred. The Board noted that Toothman's supervisor, RN Smith, admitted that she did not know whether the Home had any policy prohibiting the photocopying of care plans. Moreover, both Smith and Glenn acknowledged that there could be no breach of confidentiality if a resident's name had been removed from a plan. Morgan admitted that, at the time he discharged Toothman, he had no knowledge that she had shared any information in the plans with others.

■■■■ The Board may properly look to circumstantial evidence in determining whether a dismissal was illegally motivated. *Livingston Pipe & Tube, Inc. v. NLRB*, 987 F.2d 422, 426 (7th Cir.1993). This evidence can include the employer's knowledge of the discharged employee's union activity, whether or not the dismissal closely followed the commission of other unfair labor practices by the employer, and an implausible explanation for the discharge. *Id.; NLRB v. Industrial Erectors, Inc.*, 712 F.2d at 1137. "Once the general counsel establishes that the employer was motivated by antiunion sentiment, the employer will be held in violation of the Act unless it can show that the same decisions would have been made absent the employee's protected activity." *J. Huizinga Cartage Company v. NLRB*, 941 F.2d 616, 620 (7th Cir.1991).

■■■ The evidence supports the Board's finding that the Home's reason for discharging Toothman—that she had breached resident confidentiality—was a pretext for unlawful discrimination in violation of § 158(a)(1) and (3). Toothman had a legitimate reason for photocopying the care plans, and no information concerning the Home's residents was disclosed to others. In light of this evidence, the Board could reasonably

conclude that Toothman, who had previously been subjected to the Home's unfair labor practices, would not have been discharged absent her union activities. Rather, termination was the final step in a series of reprisals against an employee who had been an active union adherent from the start.

**B.** *The Second Order*

Discharge of LPN Michelle Sands

■■ On February 14, 1991, LPN Michelle Sands, who had been placed on on-call status as a result of the August 10, 1990 schedule, met with Director Glenn to discuss maternity leave. Sands told Glenn that she planned to take six weeks off following her delivery, scheduled for early March. Glenn said fine, adding that Sands should provide her with a medical release permitting her to work until the date of delivery. Sands provided Glenn with a note from her doctor on February 19. She delivered her child on March 6.

The ALJ conducted hearings on the allegations of unfair labor practices against the Home on April 1–3.[24] Sands was called as a witness by the NLRB; she was the sole employee representative seated at Board counsel's table. During a break in the hearing, Sands was speaking with LPN Deanna Bly when the two were joined by Administrator Morgan. Bly asked Sands when she planned to return to work, and Sands replied that she would return in a couple of weeks, once she had received medical clearance from her doctor. Morgan said nothing about Sands's status as a Home employee at that time.

Two weeks later, Sands contacted Ward Clerk Paula Chesser to notify the Home that she was able to return to work. Chesser responded, "Okay." Because she was not subsequently contacted to work, Sands applied for unemployment compensation. On April 24, the Unemployment Compensation Board (UCB) notified her that the Home was contesting her application for benefits on the ground that she had quit her job.

---

**24.** These hearings resulted in the first order.

Sands immediately phoned Morgan, who told her that the Home assumed she had quit because she had not filled out papers requesting a leave of absence as required by the Home's employee handbook. Sands replied that Glenn did not mention the need to fill out any forms when the two met on February 14. Morgan stated that Glenn should have done so and, when asked by Sands if she still had a job, told her everything was fine and instructed her to call Joan Bell, the Home's personnel director. Morgan added that Sands should refer the UCB to him if there were any more problems.

Sands telephoned Bell the same day and related what Morgan had said. Bell replied that Sands was still required to complete the relevant paperwork requesting a leave of absence. When Sands relayed this information to Morgan in a subsequent call, Morgan disagreed with Bell and again instructed Sands to refer the UCB to him. Later that day, after unsuccessfully trying to contact Morgan, UCB informed Sands that it would resume payment of her unemployment benefits. Subsequently, Sands received a letter from UCB stating that, after discussing the matter with the Home, UCB had determined that she had not quit her job.

On May 14, Sands received another letter from the UCB, this time notifying her that the Home was appealing the UCB's finding that Sands had not quit as well as its decision to resume unemployment benefits. Sands telephoned Morgan, who denied any knowledge of the appeal. Morgan suggested that Sands call the Home's insurance carrier and, when asked by Sands who she should contact at the Home about scheduling work, told her to call Julia Little. When Sands called Little and told her that she was available to work, Little said that she had just been informed by Morgan that Sands no longer worked for the Home.

Sands then called Morgan and demanded an explanation for his statement to Little. Morgan said that he had not intended to

mislead her, but that the Home's "bosses" felt that she had quit because she had not filled out medical leave papers. When Sands reminded him that he had previously told her everything was fine, Morgan merely repeated that, because she had not filled out the forms, the "bosses" felt she had quit. Sands asked if he was referring to Dan Colby, Chief Executive Officer of Shelby Memorial Hospital, and Morgan said yes. Sands then attempted to reach Colby, who did not return her calls. Approximately a week later, the Home dropped its appeal with the UCB. Sands has not worked for the Home since.

The Board found that the Home violated § 158(a)(3) and (4) by terminating Sands because of her union activities and because she testified at the April 1991 unfair labor practices hearing. The Home acknowledges that it was well aware of Sands's extensive union activities, but claims that these activities do not insulate an employee from an employer's valid rules and regulations. The Home does not now contend, as it did before the ALJ and the Board, that it was entitled to treat Sands as if she had quit because she did not complete the appropriate paperwork. Rather, the Home takes the position that the leave policy set forth in the employee handbook "did not give Sands any right to a leave of absence" because she was not a full-time employee.[25] The Home also claims that Sands never advised the Home that she was going to be absent from work for more than three days, and never supplied the Home with a written work release from her physician upon her return. Finally, the Home asserts that, in order to show discriminatory treatment of Sands, counsel for the NLRB bore the burden of showing that the Home gave similar leave to persons who, like Sands, were not full-time employees.

The Board's finding that Sands was effectively terminated for her union participation and testimony at the unfair labor practices

---

**25.** That policy states:

After continuous employment of at least one year, full-time employees are eligible to request a leave of absence for legitimate cause, such as extended illness, further education or maternity leave.

Request for leave of absence shall be in the form of a request form or letter addressed to the supervisor and submitted at least 30 days in advance of the starting date of the proposed leave....

hearing before the ALJ is amply supported by the evidence. As the Board noted, the Home's assumption that Sands had voluntarily left was, to say the least, inconsistent with her actions, including her discussion with Nursing Director Glenn about maternity leave, her telephone call notifying the Home that she had been cleared by her doctor to return to work, and her repeated calls to Morgan in an attempt to secure her job. The Board also noted that the rule governing leave in the employee handbook applied only to full-time employees, concluding that Sands was under no obligation to submit a request for maternity leave under this provision. The Home seizes upon this conclusion in this court, arguing that Sands had no right to maternity leave under the policy in the first place and thus her leave of absence could properly be treated by the Home as a voluntary departure from her job. Because this argument was not raised before the ALJ or the Board, however, it is waived. *See* 29 U.S.C. § 160(e). *See also Woelke & Romero Framing Company, Inc. v. NLRB*, 456 U.S. 645, 665–66, 102 S.Ct. 2071, 2083, 72 L.Ed.2d 398 (1982). The Home has not alleged, much less established, any extraordinary circumstances that would allow it to bypass § 160(e)'s waiver rule. *See P\*I\*E Nationwide, Inc.*, 923 F.2d at 516 n. 13; *NLRB v. American Printers & Lithographers*, 820 F.2d 878, 881 n. 2 (7th Cir.1987).

The Board found that Nursing Director Glenn said nothing in her discussion with Sands about the need to submit papers to receive medical leave, nor informed Sands that an oral request for leave was insufficient. Moreover, the evidence of record shows that the Home did not require strict adherence to handbook policy, even of those to whom it indisputably applied: LPN Toothman, a full-time employee at the time, took medical leave from November 5, 1990 to January 2, 1991 without submitting a written request and was not considered to have quit. Indeed, the Board found that the Home did not produce a single example of an employee who was either discharged or assumed to have quit as a result of failing to submit a written request for a leave of absence.

The Home first took the position that Sands had quit her job only after she had testified at the April 1991 hearing, more than a month after she had left work to give birth. At the hearing, Sands told LPN Bly, in the presence of Director Morgan, that she intended to return to work in a couple of weeks. Morgan made no response, supporting the inference, drawn by the Board, that the Home did not believe at that time that Sands had stopped working there for good.

The Home's argument that Sands did not present the Home with a written release from her doctor when she sought to return to work is irrelevant to the issue of whether Sands was effectively terminated. The Home does not claim that, but for a written release, Sands would have been promptly reinstated. Likewise, the argument that the Board failed to show that the Home granted similar leaves of absence to on-call employees is without merit. It is undisputed that Glenn approved Sands's request for time off. Once approval was given, the issue became why the Home assumed Sands had quit when all indications were to the contrary. The Board adequately demonstrated that the Home's leave "policy" depended largely on the identity, not the status, of the employee, and discriminatory treatment of employees whose identity is linked to union activities violates the NLRA.

The Home's insistence that Sands had quit, when the evidence clearly shows she did not, amounted to discharge in violation of § 158(a)(3). That her termination was motivated, in part, by her appearance at the April 1991 Board hearing violates § 158(a)(4). Substantial evidence supports both findings.

## IV. *Conclusions*

The record in these cases reveals that the Home was actively hostile toward the union organization efforts of its employees, and substantial evidence supports the challenged findings of violations of § 158(a)(1), (3), and (4). Accordingly, the Board's applications for enforcement are granted in their entirety.

ENFORCED